UNITED STATES of America ex rel. Sally A. REAGON, Plaintiffs,

v.

EAST TEXAS MEDICAL CENTER REGIONAL HEALTHCARE SYSTEM, et al., Defendants.

No. CIV.A.H–97–3310.

United States District Court, S.D. Texas, Houston Division.

March 5, 2003.

---

Michael F. Hertz, Dept. of Justice, Washington, DC, Joe Mirsky, Jill O. Venezia, Office of U.S. Attorney, Houston, TX, John Robert Craddock, Barnett & Craddock, Houston, TX, for plaintiffs.

Bruce W. Bowman, Jr., Godwin Gruber LLP, Robert M. Roller, Roller & Allensworth, Austin, TX, for defendants.

***ORDER ADOPTING MAGISTRATE JUDGE'S MEMORANDUM AND RECOMMENDATION and AMENDED MEMORANDUM AND RECOMMENDATION***

GILMORE, District Judge.

This case is before the Court on the Plaintiff's Second Amended Complaint. The Defendants have filed a Motion to Dismiss (Instrument No. 139) and a Motion for Summary Judgment (Instrument No. 141) on the claims that have been raised by the Plaintiff. The Court has

reviewed the Memorandum and Recommendation (Instrument No. 177) signed by Magistrate Judge Mary Milloy on December 20, 2002, regarding Instrument Nos. 139 and 141. Plaintiff timely filed objections (Instrument No. 177) to which the Defendant filed a response (Instrument No. 178).

The Court has also reviewed the Amended Memorandum and Recommendation (Instrument No. 180) signed by Magistrate Judge Mary Milloy on February 10, 2003, also regarding Instrument Nos. 139 and 141. Defendant timely filed objections (Instrument No. 181).

The Court has made a de novo review of the Magistrate Judge's recommended dispositions to which objections were raised, Rule 72(b), Fed.R.Civ.P.; 28 U.S.C. § 636(b)(1)(C); *McLeod, Alexander, Powel & Apffel P.C. v. Quarles*, 925 F.2d 853, 855 (5th Cir.1991), and after consideration of the applicable law, is of the opinion that said Memorandum and Recommendation should be adopted by this Court. Except for one new point, the Plaintiff's most recent objections to the Amended Memorandum and Recommendation repeat arguments that she already lodged against the original recommendation. (*See* Docket Entry # 177, # 178, # 181). Plaintiff's new argument is that the recommendation is faulty because it required her "to produce evidence of injury to the government in the CON process." * (Docket Entry # 181, ¶ 5). The Court would first note that this argument is raised out of time, because it addresses a section of the recommendation that was not amended in February. (*See* Docket Entry # 181, ¶ 5; Docket Entry # 180, pp. 51–52). Second, although Plaintiff is correct that an qui tam claimant need not show that the government suffered a financial injury from an alleged false claim, the Fifth Circuit does require a showing that the falsehood alleged was "material." *U.S. v. Southland*

*Mgmt. Corp.*, 288 F.3d 665, 675 (2002); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997). The magistrate included the referenced section to demonstrate that Plaintiff failed to make such a showing. Finally, Plaintiff's objection, even if valid, does not affect the recommendation's ultimate finding that Reagan has not raised a fact issue that she is the original source of any information underlying her claim.

The Court would note that the Plaintiff has slightly revised one of her previous arguments to present an alternative theory of recovery based upon whether Defendants' compliance with the state-mandated Certificate of Need was a pre-requisite to obtaining the government benefits. This question although not specifically addressed by the Defendants' motions also would not affect the recommendation's ultimate finding.

It is therefore, ORDERED, ADJUDGED and DECREED that United States Magistrate Judge Milloy's Memorandum and Recommendation and the Amended Memorandum and Recommendation are hereby adopted by this Court.

The Clerk shall enter this Order and provide all parties with a true copy.

### AMENDED MEMORANDUM AND RECOMMENDATION ON THE MOTION BY THE EAST TEXAS DEFENDANTS TO DISMISS FOR LACK OF JURISDICTION

Milloy, United States Magistrate Judge.

On December 20, 2002, this court recommended that Plaintiff's Second Amended Complaint be dismissed, with prejudice, because she cannot show the requisite standing to prosecute a suit under the False Claims Act. (Docket Entry # 177). Relator Sally A. Reagan ("Reagan," "Plaintiff") filed objections to that recom-

mendation, and Defendants East Texas Medical Center Regional Healthcare System,[1] East Texas Medical Center Regional Health Facilities,[2] and East Texas Medical Center (collectively "East Texas," "Defendants") have responded to them. (Docket Entry # 178, 179). In deference to Plaintiff's objections, the court considered anew the evidence Reagan submitted in her effort to defeat Defendants' motion for summary judgment. (Docket Entry # 150, 151, 173). That review of Plaintiff's submissions uncovered no reason to disturb the recommendation. But, in light of Plaintiff's arguments, it is best to clarify the findings and conclusions issued to date. In addition, because the jurisdictional issues raised by Defendants' motion to dismiss are "intertwined with the merits," it should be emphasized that this matter was reviewed under a Rule 56(c) summary judgment standard. *See Clark v. Tarrant County, Tex.*, 798 F.2d 736, 741–42 (5th Cir.1986); *Williamson v. Tucker*, 645 F.2d 404, 415–16 (5th Cir.1981).

As a convenience to the parties, any finding or conclusion that has been amended or supplemented is incorporated in the language of the previous recommendation and is set out in bold typeface to distinguish it from the original findings. It is RECOMMENDED that Plaintiff's Second Amended Complaint should be DISMISSED, with prejudice.

## Background

From April 1991 to May 1992, Sally Reagan was the executive director of University Park Hospital ("University Park," "UPH"), a non-profit psychiatric hospital in Tyler, Texas.[3] (Plaintiff's Second Amended Complaint ¶ 1, Docket Entry # 89). Plaintiff alleges that, at all relevant times, University Park "operated as the alter ego of" the East Texas Defendants, non-profit corporations that provide health care services in eastern Texas.[4] (*Id.* ¶¶ 4, 31). During Reagan's tenure at University Park, she reportedly discovered certain "financial irregularities" that she characterizes as "false reporting to the Medicare Program." (Affidavit of Sally A. Reagan, Sept. 14, 1998 ["First Reagan Aff."], p. 6, Docket Entry # 40; Second Reagan Aff., ¶ 26). Reagan contends that she was terminated from the hospital because she attempted to investigate these "irregularities." (First Reagan Aff., p. 6; Second Reagan Aff. ¶¶ 25, 26). Following her termination, Reagan contacted the Health Care Financing Administration ("HCFA"),[5] the federal agency which administers the Medicare program for the U.S. Department Health & Human Services ("DHHS"), and reported her suspicions that East Texas and University Park

1. East Texas Medical Center Regional Healthcare System was formerly known as "East Texas Hospital Foundation and Affiliates" and as "East Texas Hospital Foundation." (Plaintiff's Second Amended Complaint ¶ 4).

2. East Texas Medical Center Regional Health Facilities was formerly known as "East Texas Regional Health Facilities," "East Texas Hospital Foundation," and as "East Texas Hospital Foundation and Affiliates." (*Id.*).

3. University Park Hospital was formerly known as "Tyler Psychiatric Hospital." (Plaintiff's Second Amended Complaint ¶ 5, Docket Entry # 89). The hospital was dismissed from this litigation on February 16, 2000. (Docket Entry # 113).

4. In making her allegations, Plaintiff does not, for the most part, distinguish the three East Texas entities she has named as defendants to this action.

5. HCFA is now known as the Centers for Medicare and Medicaid Services ("CMS"). (East Texas Defendants' Appendix (Supplemental) to Motion for Summary Judgment, Docket Entry # 171 ["Defendants' Third Appendix"], pp.26–72, Videotaped Oral Deposition of Freddie Kemp, Sept. 10, 2002 ["Kemp Depo."], p. 6).

were engaged in Medicare fraud. (East Texas Defendants' Appendix (Supplemental) to Motion for Summary Judgment, Docket Entry # 171 ["Defendants' Third Appendix"], pp. 244–45, Letter from Diane Bomash, HCFA Technical Review Section, to Sally Reagan, Feb. 11, 1993 ["Bomash Letter"], at 1). Reagan also contacted Blue Cross and Blue Shield of Texas, Inc. ("Blue Cross"), the fiscal intermediary between HCFA and Medicare claimants in Texas.[6] (Plaintiff's Second Amended Complaint ¶¶ 6, 40; Defendants' Third Appendix, pp. 73–75, Letter from Ed Lessard, Acting Regional Administrator, HCFA Region VI, to Senator Kay Bailey Hutchison, Apr. 23, 1997 ["Lessard Letter"], at 1; Defendants' Third Appendix, pp.26–72, Videotaped Oral Deposition of Freddie Kemp, Sept. 10, 2002 ["Kemp Depo."], pp. 11–12). In addition, Reagan filed a lawsuit, in a Texas state court, against University Park, East Texas Medical Center ("ET Medical Center"), and others. (Evidentiary Appendix to the East Texas Defendants' Motion for Summary Judgment and Motion to Dismiss for Lack of Jurisdiction, Docket Entry # 143 ["Defendants' First Appendix"],[7] Ex. A: Plaintiff's First Amended Original Petition, *Reagan v. University Park Hospital,* No. 93–1034–C, ¶¶ 11–14 (241st Judicial Dist., Smith County, Tex., May 20, 1994) ["State Court Petition"]). In that lawsuit, Reagan alleged, among other things, that she was fired from University Park because she had refused "to become complicit in fraud and to aid and abet criminal conduct."[8] (*Id.* ¶¶ 11–14). Later, Reagan alleged, specifically, that "she was fired because she refused to go along with [illegal] Medicare reporting." (Defendants' First Appendix, Ex. L): University Park Hospital's Motion for Summary Judgment, *Reagan v. University Park Hospital,* No. 93–1034–C, pp. 13, 15 (241st Judicial Dist., Smith County, Tex., Sept. 10, 1996) (citing Deposition of Sally Reagan, Vol. IV, Nov. 2, 1994, pp. 66, 71).

While the state lawsuit was pending, Plaintiff filed this federal suit, on behalf of the United States of America (the "government"), under the· qui tam provision of the False Claims Act, 31 U.S.C. § 3729, et seq. (the "Act," the "FCA"). (Original Complaint, Docket Entry # 3; *and see* Defendants' First Appendix, Ex. E: *Reagan v. University Park Hospital,* No. 12–97–00351–C.V. (Tex.App.—Tyler 1999, writ denied) ["*Reagan I*"]). Although the government has been provided numerous opportunities to intervene in this action, it has chosen not to do so. (Docket Entry # 8).

The complicated procedural journey that Reagan's federal lawsuit has traveled is set out in a previous memorandum, entered on June 19, 2002. (Docket Entry # 146). It should be noted, however, that the current complaint is Plaintiff's third attempt to articulate claims against the East Texas Defendants. (*See* Docket Entry # 3, Docket Entry # 61, Docket Entry # 89). Plaintiff's First Amended Complaint was dismissed, on motion of East Texas and

---

**6.** Blue Cross was dismissed from this litigation on September 30, 2002. (Docket Entry # 169).

**7.** Two separate instruments are identified as item # 143 on the court's docket. The other is "Plaintiff's Unopposed Motion for Extension of Time to Respond to East Texas Defendants' Motion for Summary Judgment, Motion to Dismiss for Lack of Jurisdiction, and Motion to Strike Plaintiff's Expert Witnesses."

**8.** In addition to her claim for wrongful discharge, Reagan also made claims for common law fraud, breach of contract, slander, and the intentional infliction of emotional distress. (Defendants' First Appendix, Ex. A: Plaintiff's First Amended Original Petition, *Reagan v. University Park Hospital,* No. 93–1034–C (241st Judicial Dist., Smith County, Tex., May 20, 1994)).

others, for failure to comply with Rule 9(b) of the Federal Rules of Civil Procedure in pleading fraud allegations. (Docket Entry # 99). Plaintiff was permitted to re-state her claims, but was warned that the ordered amendment was her "last opportunity ... to set out a claim sufficient to defeat a proper motion under Rule 12(b)." (Docket Entry # 87, at 8). Plaintiff's Second Amended Complaint, the subject of the pending motion, was filed on July 29, 1999. (Docket Entry # 89).

To appreciate Plaintiff's claims fully, it is necessary to detail the history of University Park and its relationship with the East Texas entities. University Park was built in the early 1980s as a cooperative project of Mother Frances Hospital ("Mother Frances") and Defendant East Texas Regional Health Care Facilities ("ET Facilities"), both located in Tyler. (Appendix to the East Texas Defendants' Objections and Motion to Strike Evidence Filed by Relator in Response to East Texas Defendants' Motions for Summary Judgment and Motion to Dismiss for Lack of Jurisdiction, Docket Entry # 159 ["Defendants' Second Appendix"], Ex. D: Affidavit of Elmer Ellis ["Ellis Aff."] ¶ 2). On January 28, 1983, the Texas Health Facilities Commission (the "Commission") issued a Certificate of Need ("CON"), which authorized Mother Frances and ET Facilities to construct and operate the new University Park Hospital as a psychiatric treatment center in the Tyler area. (Plaintiff's Second Amended Complaint ¶ 14; Evidentiary Appendix, Volume One of Two to Plaintiff's Response to East Texas Defendants' Motion for Summary Judgment, Docket Entry # 150 ["Plaintiff's First Appendix"], Ex. 18: Certificate of Need AH81–1027–013 ["Certificate of Need"], pp. 1, 33–34). The CON, at that time a requirement under Texas law, was issued at Defendants' request. When the CON was granted, it directed that "[t]he Certificate Holders must complete the approved project at a cost not to exceed $5,378,250." ( p. 34, ¶ II.C). This "total project cost" was to include the amounts designated for site acquisition and preparation, soil tests, equipment purchases, professional services, and those "costs associated with financing," as well as the actual sum necessary to construct the University Park building. (*Id.*, p. 28, ¶ 3). The CON specified that $3,753,611 of the project costs would be financed through the issuance of revenue bonds and, further, that the East Texas Hospital Foundation ("ET Foundation") was to contribute $2,000,000 in cash to the project. (*Id.*, p. 28, ¶ 6). (*Id.*). Despite that specification, it appears that East Texas never contributed the promised $2 million toward the hospital's construction. (Plaintiff's Second Amended Complaint ¶¶ 14, 15; Defendants' First Appendix, Ex. D: Deposition of Elmer Ellis, Dec. 5, 1995 ["Ellis Depo."], p. 35). Instead, East Texas financed the building by issuing $5.6 million in revenue bonds, in 1984. (Plaintiff's Second Amended Complaint ¶¶ 14, 15; Ellis Depo. pp. 26–27, 35–37; Ellis Aff. ¶ 3). In February 1985, University Park informed the Commission that the costs associated with financing exceeded the amount anticipated by $430,000. (Plaintiff's First Appendix, Ex. 19: Amended Certificate of Need Order AH81–1027–013A (012285) ["Amended Certificate of Need"], p. 2, ¶ 8). The costs for site work, equipment, professional services, and construction were also higher than expected. (*Id.*, pp. 1–2, ¶¶ 5–7, 9). Because of these additional costs, the Commission amended the CON "to require completion of the project at a cost not to exceed $6,286,993." (*Id.*, p. 2). When the hospital was completed, in 1985, it was at a reported cost of $6.2 million. (Plaintiff's Second Amended Complaint ¶ 27; Ellis Aff. ¶ 5).

It is undisputed that ET Medical Center, a subsidiary of ET Foundation, owned

the completed University Park building and grounds. (Certificate of Need, p. 29, ¶ 11; Ellis Aff. ¶ 4). The psychiatric hospital leased those facilities for $726,000 each year, pursuant to a contract with the ET Foundation. (Plaintiff's Second Amended Complaint ¶¶ 15, 38; Certificate of Need, p. 3, ¶ 14; Ellis Aff. ¶ 4, Ex. 1: Lease Agreement, Sept. 16, 1992, art. IV). The evidence shows that the hospital also purchased certain "ancillary services," including laundry, maintenance, radiology, and clinical laboratory services, from the East Texas Defendants. (Plaintiff's Second Amended Complaint ¶¶ 16, 31, 38, 59; Plaintiff's First Appendix, Ex. 2: Affidavit of Sally A. Reagan, Jul. 3, 2002 ["Second Reagan Aff."], ¶ 18). There is no question that University Park reported all of these operating costs to Medicare each year, and that Medicare reimbursed the hospital for some, but not all, of them. Plaintiff's qui tam action is based, primarily, on her allegation that University Park made "false and fraudulent" statements in the annual cost reports that it submitted to Medicare. (Plaintiff's Second Amended Complaint ¶¶ 66, 72).

From a review of the pleadings, the court discerns that these "false statements" fall into three general categories. First, Plaintiff claims that, in the annual cost reports that were submitted to Blue Cross, the Medicare fiscal intermediary, University Park misrepresented its compliance with the CON requirements. (Id. ¶¶ 14, 15, 21, 23, 27, 36; Response to Motion for Summary Judgment ¶ 12). Second, she alleges that University Park certified, falsely, that it was in compliance with the applicable Medicare regulations. (Plaintiff's Second Amended Complaint ¶¶ 20, 22–23, 31, 32, 38, 43, 58–59, 63; Response to Motion for Summary Judg-

ment ¶¶ 26–29, 34–37). Her specific contention on this allegation is that the hospital violated the applicable regulations because it did not pay "reasonable" rates for the goods and services purchased from East Texas, and because it failed to keep proper records of its actual expenditures. (Id.). Finally, Plaintiff alleges that University Park consistently misstated its status as a "related party to East Texas," and so received reimbursements to which it was not entitled. (Plaintiff's Second Amended Complaint ¶¶ 17, 19, 24, 33, 39, 60, 63; Response to Motion to Summary Judgment ¶¶ 24–26, 30–33, 38). Reagan maintains that these actions, singly and together, constitute violations of the False Claims Act. (Plaintiff's Second Amended Complaint ¶¶ 64–66, 72) (citing 31 U.S.C. § 3729(a)(3), (7)). In addition, she argues that, because Defendants did not "disclose their fraudulent conduct" to the government, they are guilty of violating the criminal health care fraud statutes, as well. (Id. ¶ 67) (citing 42 U.S.C. § 1320a–7b(a)(3)). If successful, Plaintiff hopes to recover all of the alleged Medicare overpayments made to University Park, along with any appropriate penalties and interest. (Id. ¶¶ 80–83).

In the motion to dismiss, East Texas argues that the court does not have subject matter jurisdiction to entertain Plaintiff's qui tam claims because she has not met the FCA's jurisdictional requirements.[9] (East Texas Defendants' Motion to Dismiss for Lack of Jurisdiction ["Motion to Dismiss"], ¶ VI, Docket Entry # 139) (citing 31 U.S.C. § 3730(e)(4)). Defendants contend that, to establish jurisdiction under the Act, Reagan "must show that the transactions upon which her claims are based were not publicly dis-

---

9. In addition to their motion to dismiss, Defendants have filed a motion for summary judgment, which addresses different conten-
tions, and have submitted evidence in support. (Docket Entry # 141, # 170, # 171). That evidence has been reviewed.

closed, or if they were, that she is the 'original source' of those claims." (*Id.* ¶ 9). In this instance, Defendants insist that neither prerequisite has been met. (*Id.* ¶ 12.B). Plaintiff contests East Texas's attack on the court's jurisdiction, and has supplied evidence to support her standing to bring these claims. (*See generally* Plaintiff's Response to East Texas Defendants' Motion to Dismiss for Lack of Jurisdiction ["Response to Motion to Dismiss"], Docket Entry # 147; Plaintiff's Response to East Texas Defendants' Motion for Summary Judgment ["Response to Motion for Summary Judgment"], Docket Entry # 149). Following a full review, and for the reasons discussed, it is RECOMMENDED that Defendant's motion to dismiss be treated as one for summary judgment, under Rule 56(c). It is further RECOMMENDED that Defendant's motion be GRANTED and that this action be DISMISSED because the evidence fails to support Reagan's allegation that she is an original source of the information underlying her claims.

**Standard of Review**

 Undeniably, "[f]ederal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n,* 138 F.3d 144, 151 (5th Cir.1998); *see also Coury v. Prot,* 85 F.3d 244, 248 (5th Cir.1996). In a Rule 12(b)(1) inquiry, the plaintiff bears the burden to show that the court has jurisdiction to entertain her claims. *Santos v. Reno,* 228 F.3d 591, 594 (5th Cir.2000); *Stockman,* 138 F.3d at 151. If the plaintiff cannot .meet this burden, and "it appears that the subject matter jurisdiction is lacking," then the court is required to dismiss the case, without reaching the merits. *Stockman,* 138 F.3d at 151; *see Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 172 (5th Cir.1994). Here, Defendants rely on the provisions of the False Claims Act itself to challenge the court's subject mat-

ter jurisdiction. In that regard, the United States Court of Appeals for the Fifth Circuit has held that, if the same "statute provides both the basis of federal court subject matter jurisdiction and the cause of action," as in this case, then "the jurisdictional inquiry is so intertwined with the merits that it cannot be separately addressed." *Clark v. Tarrant County, Tex.,* 798 F.2d 736, 741 (5th Cir.1986); *Williamson v. Tucker,* 645 F.2d 404, 416 n. 10 (5th Cir.1981). *C.f. U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1159 (10th Cir.1999); *Wercinski v. Int'l Bus. Machines Corp.,* 982 F.Supp. 449, 454 (S.D.Tex.1997). If the jurisdictional and substantive inquiries are so intertwined, and "the plaintiff's federal claim is neither insubstantial, frivolous, nor made solely for the purpose of obtaining jurisdiction, the district court should find that it has jurisdiction over the case and deal with the defendant's challenge as an attack on the merits." *Clark,* 798 F.2d at 742 (citing *Bell v. Hood,* 327 U.S. 678, 682–84, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Williamson,* 645 F.2d at 415). In such a situation, it is appropriate for a district court to resolve the motion to dismiss under Rule 12(b)(6) or, "after proper conversion into a motion for summary judgment, under Rule 56." *Hafter,* 190 F.3d at 1159; *Wercinski,* 982 F.Supp. at 454; *accord Williamson,* 645 F.2d at 415–16. In this instance, Defendants have asked the court to consider a host of exhibits to resolve the Rule 12(b)(1) motion to dismiss. (*See* Docket Entry # 143, # 159). And, in addition to their request for a dismissal, Defendants have also filed a motion for summary judgment, with accompanying exhibits. (Docket Entry # 141, # 170, # 171). Plaintiff has responded to both motions, with further evidentiary support of her FCA claims. (*See* Docket Entry # 149, # 150, # 151, # 172, # 173). Because the merits of Plaintiff's claims are intertwined

with the jurisdictional inquiry, and because the court has been asked to rely on evidentiary material submitted by the parties, Defendant's motion to dismiss will be viewed as one for summary judgment. FED. R. CIV. P. 12(b); *Hafter*, 190 F.3d at 1159; *Clark*, 798 F.2d at 741–42; *Williamson*, 645 F.2d at 415–16; *Wercinski*, 982 F.Supp. at 454. The motion is, therefore, governed by the Rule 56 standard.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the non-movant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *Id.* When the moving party has met its Rule 56 burden, the non-movant cannot survive a motion for summary judgment by resting merely on the allegations in it pleadings. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.1995). If the movant does meet his burden, the non-movant must go beyond the pleadings and designate specific facts to show that there is a genuine issue for trial. *Little*, 37 F.3d at 1075. Further, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir.1998)

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

To meet its burden, the nonmoving party must present "significant probative" evidence indicating that there are issues of fact remaining for trial. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir.1994). If the evidence presented to rebut the summary judgment motion is only colorable or not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202. (1986). But, in deciding a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Id.* at 248, 106 S.Ct. 2505. However, "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Little*, 37 F.3d at 1075.

**Discussion**

### Criminal Fraud

As noted, Plaintiff has pleaded that Defendants violated the federal criminal statutes, in perpetrating the alleged fraud against Medicare. (Plaintiff's Second Amended Complaint ¶ 67). In support of this claim, she points to 42 U.S.C. § 1320a–7b(a)(3). That section details liability for criminal penalties if an individual, with fraudulent intent, conceals any event that affects either his own right to a benefit or payment under a federal health care program, or "the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment." 42 U.S.C. § 1320a–7b(a)(3). But, in citing this statute, Reagan has

provided no authority that would allow her to pursue such a claim. In fact, she has not shown, or even argued, that the statute permits a private right of action, and such a right is unlikely to be recognized in this circuit. Indeed, at least one circuit has held, expressly, that private parties have no right to enforce the Medicare program through the criminal statute. *West Allis Memorial Hosp., Inc. v. Bowen*, 852 F.2d 251, 255 (7th Cir.1988). The prosecution of criminal acts is within the sole discretion of the executive branch of the government. *Id.* That ruling, by the United States Court of Appeals for the Seventh Circuit, has been cited with approval by the Fifth Circuit, which remarked that, "because of the strong presumption against their creation," a private right of action should rarely be implied where none is expressly provided in the statute at issue. *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 925 n. 3 (5th Cir.1997) (citing *Bowen*, 852 F.2d at 255). It follows that no such right should be implied here. *See id.* As Plaintiff has not shown that she has standing to pursue a claim for fraud under the criminal statutes, it is RECOMMENDED that the claim be DISMISSED, with prejudice.

### *False Claims Act*

Plaintiff's most extensive allegations pertain to Defendants' purported liability for violations of the False Claims Act. (Plaintiff's Second Amended Complaint ¶¶ 19, 21, 64, 66, 72). Reagan brings her claims under subsections 3729(a)(3) and (7) of the Act.[10] (Plaintiff's Second Amended Complaint ¶¶ 64, 66, 72). Section 3729(a) states, in relevant part, that a person "is liable to the United States Government for a civil penalty" if he:

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; [or]

\* \* \* \* \* \*

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C.A. § 3729(a)(3), (7) (West Supp. 2002). Unfortunately, the Fifth Circuit has not yet had occasion to address the particular requirements of a claim under either of these subsections. Those courts that have done so, however, agree that, to bring a successful conspiracy suit under FCA § 3729(a)(3), a plaintiff must show the following:

(1) that the defendant knowingly conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim.

*Wilkins ex rel. U.S. v. Ohio*, 885 F.Supp. 1055, 1059 (S.D.Ohio 1995) (citing *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.*, 721 F.Supp. 1247, 1259 (S.D.Fla.1989)); *accord U.S. ex rel. Durcholz v. FKW Inc.*, 997 F.Supp. 1159, 1173 (S.D.Ind.1998), *aff'd*, 189 F.3d 542 (7th Cir. 1999); *Mikes v. Strauss*, 889 F.Supp. 746, 751 (S.D.N.Y.1995). Courts have also agreed on the elements of a cause of action under the "reverse" False Claims Act, de-

---

**10.** Reagan's complaint also invokes FCA subsections 3729(a)(1) and (2). (*See* Plaintiff's Second Amended Complaint, Count I). However, she has not made any allegations that implicate a violation of § 3729(a)(2). In addi-

tion, it appears that any claims under § 3729(a)(1) were lodged against University Park only, and not against the East Texas Defendants. (*See id.* § 63).

tailed in § 3729(a)(7). Those are set out below:

(1) that the defendant made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to the United States; (2) that the statement or record was false; (3) that the defendant knew that the statement or record was false; and (4) that the United States suffered damages as a result.

*Wilkins,* 885 F.Supp. at 1059 (citing *Provident,* 721 F.Supp. at 1259); *and see U.S. v. Raymond & Whitcomb Co.,* 53 F.Supp.2d 436, 445 (S.D.N.Y.1999); *U.S. v. Quick Intern. Courier, Inc.,* 965 F.Supp. 1249, 1251 (D.Minn.1996). However, without regard to whether Plaintiff has made any showing on the requisite elements, Defendants contend that she does not have standing to prosecute those claims. (Motion to Dismiss ¶ 6).

 There is no dispute that private parties may initiate actions for civil fraud under the Act's qui tam provision, as set out in § 3730(b).[11] *See U.S. ex rel. Foulds v. Texas Tech Univ.,* 171 F.3d 279, 282 (5th Cir.1999). A district court's jurisdiction to adjudicate qui tam actions, however, is limited by the language of the statute itself. Those limitations are detailed in § 3730(e)(4) of the Act, which states, in relevant part, that:

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless ... the person bringing the action is an original source of the information.[12]

31 U.S.C.A. § 3730(e)(4)(A) (West Supp. 2002); *Hughes Aircraft Co. v. U.S., ex rel. Schumer,* 520 U.S. 939, 945–46, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997); *Fed. Recovery Servs., Inc. v. U.S.,* 72 F.3d 447, 450 (5th Cir.1995). It is well-settled that this jurisdictional limit serves a dual purpose. That is, it is intended both to encourage "whistle-blowing insiders" to step forward "with genuinely valuable information" of fraud against the government, and to discourage "parasitic qui tam actions by persons simply taking advantage of information already in the public domain." *Minn. Assoc. of Nurse Anesthetists v. Allina Health Sys. Corp.,* 276 F.3d 1032, 1042 (8th Cir.), *cert. denied,* 537 U.S. 944, 123 S.Ct. 345, 154 L.Ed.2d 252 (2002); *U.S. ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 649 (D.C.Cir.1994); *and see Fed. Recovery Servs.,* 72 F.3d at 452; *Wercinski v. Int'l Bus. Machines Corp.,* 982 F.Supp. 449, 455–56 (S.D.Tex. 1997). Stated differently, § 3730(e)(4) codifies the "twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the

---

**11.** The False Claim Act's qui tam provision is named from the Latin phrase *"qui tam pro domino rege quam pro seipso,"* which means, "he who so much for the king as for himself." *U.S. ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 647 n. 1 (D.C.Cir.1994)

**12.** It should be noted that the Act's jurisdictional provision was amended on October 27, 1986. Pub.L. No. 99–562 § 3, 100 Stat. 3157 (1986) (codified as amended as 31 U.S.C.A. § 3730(e)). Qui tam suits which are based on allegedly wrongful conduct that took place before that date are governed by the Act's former jurisdictional contours. *Hughes Aircraft Co. v. U.S., ex rel. Schumer,* 520 U.S. 939, 945–46, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). Here, Plaintiff has asserted that her claims are based on an alleged "continuing violation" of the FCA. (Response to Motion for Summary Judgment ¶ 12). Although the first allegedly "false" cost report, about which Plaintiff complains, was submitted to Medicare in August 1986, that filing does not control the current jurisdictional inquiry. (*See* Plaintiff's Second Amended Complaint ¶ 19). Accordingly, the court has examined Plaintiff's claim under the Act as amended in 1986.

government is not equipped to bring on its own." *Springfield,* 14 F.3d at 652. To satisfy these goals, the Fifth Circuit has set out a specific inquiry that a court must undertake, to ascertain if jurisdiction is present, before it may entertain a qui tam action. *Fed. Recovery Servs.,* 72 F.3d at 450. To determine if jurisdiction is proper, courts must address the following three questions:

> 1) whether there has been a "public disclosure" of [any] allegations or transactions, 2) whether the qui tam action is "based upon" such publicly disclosed allegations, and 3) if so, whether the relator is the "original source" of the information.

*Id.* If the answer to the first two questions is "yes," then the qui tam suit is barred, unless the relator can show that she is the "original source" of that publicly disclosed information. *Id.* at 451. It follows that, to establish proper jurisdiction here, Reagan must show either that this lawsuit is not "based upon ... publicly disclosed allegations," or that she is the "original source" of the information from which those allegations arose. *See id.;* 31 U.S.C.A. § 3730(e)(4)(A).

### 1. Public Disclosure

In response to Plaintiff's claims, Defendants argue that "the transactions and allegations that form the basis of this FCA lawsuit were ... publicly disclosed" in three different ways: through Reagan's previous state court lawsuit; through disclosures made under the Freedom of Information Act ("FOIA"); and through audits of the hospital's cost reports that Blue Cross conducted in 1987, 1991, and 1995. (Motion to Dismiss ¶ 10). Plaintiff insists, though, that "[a] full-fledged public disclosure of all the facts of the fraud in this case had not occurred" before she initiated this lawsuit. (Response to Motion to Dismiss at 2). However, under the prevailing law, it does not appear that "all the *facts* of the fraud" need be made public to implicate the FCA's "public disclosure" bar. Instead, the Act specifies that a court's jurisdiction may be foreclosed if there has been a "public disclosure of *allegations or transactions.*" 31 U.S.C.A. § 3730(e)(4)(A); *Fed. Recovery Servs.,* 72 F.3d at 450. Although the Fifth Circuit has not addressed this specific statutory provision in any detail, other appellate and district courts have done so. *See, e.g., A–1 Ambulance Serv., Inc. v. California,* 202 F.3d 1238, 1243 (9th Cir.2000); *U.S. ex rel. Jones v. Horizon Healthcare Corp.,* 160 F.3d 326, 331–32 (6th Cir.1998); *U.S. ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 740–41 (3rd Cir.1997); *U.S. ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509, 1511–14 (8th Cir.1994); *Springfield,* 14 F.3d at 653–54; *Wang v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir.1992); *U.S. ex rel. Johnson v. Shell Oil Co.,* 33 F.Supp.2d 528, 533–34 (E.D.Tex.1999) ("*Shell Oil II*"); *Wercinski,* 982 F.Supp. at 458. The prevailing law on this section of the Act was first articulated by the United States Court of Appeals for the District of Columbia Circuit in *U.S. ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645 (D.C.Cir.1994). In that case, the court of appeals held that "a distinction between 'allegations or transactions' and ordinary 'information' " is warranted "as a matter of common usage and sound interpretation of the FCA." *Springfield,* 14 F.3d at 653. Further, the court differentiated between a public disclosure of "allegations" and a disclosure of "transactions." *Springfield,* 14 F.3d at 653–56. Among those courts which have analyzed those terms, all are in agreement with the reasoning detailed by the D.C. Circuit. *See A–1 Ambulance Serv.,* 202 F.3d at 1243; *Jones,* 160 F.3d at 331–32; *Dunleavy,* 123 F.3d at 740–41; *Rabushka,* 40 F.3d at 1511–12; *Wang,* 975 F.2d at 1418; *Shell Oil II,* 33 F.Supp.2d at

533–34; *Wercinski*, 982 F.Supp. at 458 (all citing *Springfield*). For example, in *Springfield*, the court defined an "allegation" as a "conclusory statement implying the existence of provable facts." 14 F.3d at 653–54. A district court, sitting in this circuit, applied that same standard to determine whether jurisdiction was present under the FCA, in *U.S. ex rel. Johnson v. Shell Oil Co.*, 33 F.Supp.2d 528, 533–34 (E.D.Tex.1999) ("*Shell Oil II*"). Applying that definition, the trial court determined that the pertinent "allegation of fraud," in the instance before it, was an allegation that "the major oil companies ha[d] been underpaying their royalty obligations on oil taken from federal and Indian owned land." 33 F.Supp.2d at 533. The court found further that an explicit allegation of fraudulent conduct had been publically aired, and so it concluded that the qui tam suit was barred by the FCA's jurisdictional limits. *Id.* at 540. In addition, the court cited *Springfield* for the proposition that, if the "allegations" under scrutiny have been disclosed, then it is irrelevant that proof of the alleged fraud has not entered the public sphere as well. *Id.* 33 F.Supp.2d at 534 (citing *Springfield*, 14 F.3d at 654–55). At least three other circuit courts, when discussing similar issues, have agreed with this precept. *See Jones*, 160 F.3d at 331; *Dunleavy*, 123 F.3d at 740; *Wang*, 975 F.2d at 1418.

■ On the other hand, courts have concluded that public disclosure of a "fraudulent transaction" does not occur unless some proof of the fraud is aired. Among the courts that have addressed the issue, all have decided that a transaction has been publicly disclosed only when the "material facts underlying [an] allegation of fraud" have been made public. *A–1 Ambulance Serv.*, 202 F.3d at 1243, 1245; *and see Jones*, 160 F.3d at 331; *Rabushka*, 40 F.3d at 1514; *Springfield*, 14 F.3d at 655. In defining a "fraudulent transaction," the *Springfield* court explained that

"[f]raud requires recognition of two elements: a misrepresented state of facts and a true state of facts." *Springfield*, 14 F.3d at 655, *quoted by Jones*, 160 F.3d at 331; *Dunleavy*, 123 F.3d at 741; *Shell Oil II*, 33 F.Supp.2d at 533; *Wercinski*, 982 F.Supp. at 458. Courts agree that, if both of those "material facts" have been previously disclosed, then "enough information exists in the public domain to expose the fraudulent transaction." *Springfield*, 14 F.3d at 655, *quoted by Jones*, 160 F.3d at 331; *Rabushka*, 40 F.3d at 1513–14; *Shell Oil II*, 33 F.Supp.2d at 540; *Wercinski*, 982 F.Supp. at 460; *accord A–1 Ambulance Serv.*, 202 F.3d at 1245; *Dunleavy*, 123 F.3d at 741. Again, in *Shell Oil II*, the district court found that "the true state of facts" alleged in the pleadings was "the actual value or fair market value that [oil companies] received for the oil taken from federal and Indian lands," and that "the alleged false state of the facts" was "the artificially low price" that the companies paid to the government. 33 F.Supp.2d at 534–35. The court stopped short of finding that there was sufficient information in the public domain to expose both of those "essential elements." *Id.* at 540. However, because it had already determined that the "*allegations* of fraud were clearly in the public domain well before Relators filed their suit," the court did not find it necessary to determine that the fraudulent *transaction* was also in the public domain. *Id.* (emphasis added). Indeed, it has been held, repeatedly, that "[d]isclosures which reveal *either* the allegations of fraud *or* the elements of the underlying fraudulent transaction are sufficient to invoke the jurisdictional bar." *Dunleavy*, 123 F.3d at 740 (emphasis added); *and see A–1 Ambulance Serv.*, 202 F.3d at 1243; *Jones*, 160 F.3d at 331; *Springfield*, 14 F.3d at 654, 656; *Wang*, 975 F.2d at 1418; *Shell Oil II*, 33 F.Supp.2d at 540; *Wercinski*, 982 F.Supp. at 458. Obviously, if either the

allegations or the facts of a fraud have been publicly disclosed, the "the government itself presumably can bring an action under the FCA." *Springfield*, 14 F.3d at 654; *Wercinski*, 982 F.Supp. at 460; *and see U.S. v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir.1999) ("The point of public disclosure of a false claim against the government is to bring it to the attention of the authorities."). It follows that, in this case, if sufficient information was previously disclosed so that the government is deemed "alert" to the notion that Defendants might be implicated in fraud, then there has been a "public disclosure," under the FCA's jurisdictional clause. *See A–1 Ambulance Serv.*, 202 F.3d at 1243; *Mathews*, 166 F.3d at 861; *Jones*, 160 F.3d at 331–32; *Dunleavy*, 123 F.3d at 740–41; *Fed. Recovery Servs.*, 72 F.3d at 450; *Springfield*, 14 F.3d at 653–56; *Wang*, 975 F.2d at 1418; *Shell Oil II*, 33 F.Supp.2d at 534–35; *Wercinski*, 982 F.Supp. at 458, 460. If so, then Reagan's federal claims may be barred. *See* 31 U.S.C.A. § 3730(e)(4)(A); *Schumer*, 520 U.S. at 945–46, 117 S.Ct. 1871; *Fed. Recovery Servs.*, 72 F.3d at 450.

*a. Reagan's Claims in the State Court Litigation*

Here, Defendants argue, first, that those "specific allegations and transactions that are the basis of this *qui tam* action were publicly disclosed in Reagan's pleadings in her previous, unsuccessful Employment Discrimination Case [sic]." (Motion to Dismiss ¶ 14). Plaintiff apparently concedes that her state court lawsuit did disclose "the general subject matter of the transactions" which lead to this federal action. (Response to Motion to Dismiss at 4). She insists, however, that the state court suit "was not a public disclosure within the meaning of the False Claims Act" because neither the specific allegations of fraud, nor the nature of the transactions exposed, were made public in that forum. (*Id.* at 5). In the alternative, Plaintiff seems to argue that the state court suit cannot constitute a public disclosure of the relevant allegations and transactions, as a matter of law, because that litigation never resulted in a "final judgment on the merits." [13] (*Id.* at 4).

It is true, as Plaintiff claims, that her state court lawsuit was not final when she began this federal litigation.[14] (*See Reagan I*). In fact, her claim against University Park in that forum is still pending. (Response to Motion for Summary Judgment ¶ 8; *and see* Docket Entry # 100). However, whether her state court lawsuit was resolved has no bearing on the issue of the public disclosure of her allegations

---

**13.** Plaintiff argues further that ET Facilities and East Texas Medical Center Regional Healthcare System ("ET System") were not named as defendants in the first suit, and that a public disclosure exists "[o]nly if the particular defendant has been linked to the fraudulent scheme." (Response to Motion to Dismiss at 3) (citing *U.S. ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1512 (8th Cir.1994)). The one case that Plaintiff cites for support, however, does not stand for this proposition. Further, all of the claims that Plaintiff makes against ET System and ET Facilities are also made against ET Medical Center, which *was* a party to the state lawsuit. (*See* Plaintiff's Second Amended Complaint ¶ 33). This argument is without merit.

**14.** In February 1997, the state district court granted summary judgments in favor of ET Medical Center, Mother Frances, and two individual defendants, but summary judgment was denied to University Park. *Reagan I* at 4. In September 1997, the same month in which this FCA lawsuit was filed, Reagan appealed the state court's decision. *Id.* The state appellate court affirmed the ruling in favor of the defendants on April 30, 1999. *Id.* at 1. Reagan's remaining claims against University Park were pending before the state district court when the hospital filed for bankruptcy and Reagan's state court action was stayed. (Response to Motion to Dismiss at 4; *and see* Docket Entry # 100).

in the course of that litigation. The Fifth Circuit has held that "any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for purposes of section 3730(e)(4)(A)." *Fed. Recovery Servs.*, 72 F.3d at 450 (quoting *U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1350 (4th Cir.1994)); *and see Hagood v. Sonoma County Water Agcy.*, 81 F.3d 1465, 1471 (9th Cir.1996) ("An issue need not be decided in prior litigation for the public disclosure bar to be triggered; rather, its mere disclosure suffices."). In fact, this circuit has held, expressly, that state court complaints, standing alone, constitute "public disclosures" within the meaning of the FCA. *Fed. Recovery Servs.*, 72 F.3d at 450. In her state court petition, Reagan claimed that "East Texas had misappropriated University Park Hospital construction funds in the amount of approximately $2 million which had been generated through county revenue bonds"; that East Texas had overcharged University Park on its lease; and that University Park had "overstat[ed] capital expenditures in annual Medicare cost reports submitted ... to the United States government." (State Court Petition ¶¶ 7, 8). Certainly, a person reading these claims could infer "the existence of provable facts" of Medicare fraud by these Defendants. *See Springfield*, 14 F.3d at 653–54; *Shell Oil II*, 33 F.Supp.2d at 533. The court concludes, therefore, that Reagan's state court claims are sufficient to "set government investigators on the trail of fraud," and are publicly disclosed allega-

tions for purposes of the FCA. *See Jones*, 160 F.3d at 331; *Fed. Recovery Servs.*, 72 F.3d at 450; *Rabushka*, 40 F.3d at 1514; *Siller*, 21 F.3d at 1350; *Springfield*, 14 F.3d at 653–54; *Shell Oil II*, 33 F.Supp.2d at 533; *Wercinski*, 982 F.Supp. at 460.

*b. Requests Under the Freedom of Information Act*

 Next, Defendants argue that some relevant information was "publicly disclosed" because it was produced in response to requests that Reagan made to Blue Cross and HCFA, under the Freedom of Information Act ("FOIA"). (Motion to Dismiss ¶ 15). Plaintiff apparently concedes that, in general, documents produced pursuant to a FOIA request may constitute a "public disclosure." [15] (*See* Response to Motion to Dismiss at 4). Notwithstanding that general concession, she argues here that the documents she received under FOIA did not reveal the "fraudulent nature" of the transactions at the heart of her complaint. (*Id.*). That argument, however, is at odds with Reagan's own testimony before this court. In the sworn affidavit that she submitted in an effort to defeat Defendant's earlier motion to transfer venue, Reagan states that "documents were eventually produced via requests to [sic] the Freedom of Information Act ... which provided irrefutable proof of my allegations in state court, and which are foundational to my current FCA claims." (Reagan's First Aff. at 5). Essentially, Reagan admitted that the "material facts" underlying her current fraud allegations were already public when this litigation was initiated. *See A–1 Ambu-*

---

15. The Fifth Circuit has not considered whether "[d]isclosure pursuant to a FOIA request is ... sufficient to make the transaction 'public' within the meaning of the FCA." *U.S. ex rel. Grynberg v. Praxair, Inc.*, 207 F.Supp.2d 1163, 1184 (D.Colo.2001). Those courts that have considered the question, however, agree that FOIA responses are, indeed, "public dis-

closures." *Id.* (citing *U.S. v. A.D. Roe Co.*, 186 F.3d 717, 723 (6th Cir.1999); *U.S. ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1519–20 (9th Cir.1995), *vacated on other grounds*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997)); *accord U.S. ex rel. Mistick PBT v. Housing Auth. of City of Pittsburgh*, 186 F.3d 376, 383–85 (3rd Cir.1999).

*lance Serv.*, 202 F.3d at 1243, 1245; *Jones*, 160 F.3d at 331; *Rabushka*, 40 F.3d at 1514; *Springfield*, 14 F.3d at 655; *Wang*, 975 F.2d at 1418; *Shell Oil II*, 33 F.Supp.2d at 540. By her own statement, it is clear that these documents, released under FOIA, aired at least some of the relevant "fraudulent transactions," and so are "public disclosures" under the Act. *See Jones*, 160 F.3d at 331; *Dunleavy*, 123 F.3d at 741; *Springfield*, 14 F.3d at 655; *Shell Oil II*, 33 F.Supp.2d at 533; *Wercinski*, 982 F.Supp. at 458. For that reason, this court agrees with Defendants that these documents trigger the first element of the Act's jurisdictional bar.

### c. Blue Cross Audits

█ Defendants also contend that "the information upon which [Reagan] bases her complaint was publicly disclosed when it was disclosed . . . for the Blue Cross Audit." (Motion to Dismiss ¶ 16). Reagan has not contested this assertion. There is no question that, under the plain language of § 3730(e)(4) of the Act, all "allegations or transactions" that are disclosed in an "administrative . . . report, hearing, audit, or investigation" are subject to the jurisdictional bar. U.S.C.A. § 3730(e)(4). This court has determined previously that Blue Cross serves as a federal administrative agency when it is acting in its capacity as a Medicare fiscal intermediary. (Docket Entry # 156, at 10). Any allegations or transactions that were addressed in a Blue Cross audit, report, or investigation of Medicare records, therefore, have been "publicly disclosed." *See* § 3730(e)(4). It follows that Blue Cross audits of University Park's Medicare cost reports may constitute public disclosures of the allegations and transactions relevant to this litigation.

It is undisputed that Blue Cross audited the hospital's cost reports well before Reagan initiated her qui tam action. (Plaintiff's Second Amended Complaint ¶¶ 36, 47; Defendants' Third Appendix, pp. 83–194, Videotaped Oral Deposition of Kathy Prickett, Sept. 10, 2002 ["Prickett Depo."], p. 17; Defendants' Third Appendix, pp. 251–53, Memorandum from Donald L. Dille, Regional Inspector General for Audit Services, DHHS Office of Inspector General, to M. Ben Jackson, Jr., Director, Programs and Operations Audits, Oct. 7, 1997 ["Dille Memo"], p. 2).[16] The summary judgment evidence reveals that, in the cost reports submitted for fiscal years 1985 to 1990, University Park officials stated that the hospital was not a "related party" to any East Texas entity. (Defendants' First Appendix, Ex. O: Deposition of Sally Reagan, Apr. 9, 2002 ["Second Reagan Depo."], p. 96; Prickett Depo., p. 21; Defendants' Third Appendix, pp. 1–25, Videotaped Oral Deposition of Larry P. Simmons, Jul. 16, 2002 ["Simmons Depo."], p. 38). That assertion was disputed by Blue Cross from the very beginning of the hospital's operation. (Prickett Depo., p. 21; Simmons Depo., p. 38). Whether University Park and East Texas were "related" was critical to Blue Cross's role in distributing federal monies. The outcome of that dispute affected the amount of reimbursement that the psychiatric hospital was entitled to receive from Medicare.

Under the relevant federal regulations, as described by Defendants, a "related party" is any entity that has direct or indirect control over a medical provider. (Defendants' Third Appendix, pp. 83–194, Prickett Depo., p. 15). Medicare is obligated to reimburse a provider for the entire amount of any purchase that it makes

**16.** Plaintiff has also submitted a copy of the "Dille Memo," in redacted form. (*See* Docket Entry # 151, Ex. 43).

from a non-related party, including the amount of the vendor's profits. (Kemp Depo., pp. 16–17). A purchase from a related party, however, is subject to reimbursement only to the extent of the vendor's "actual costs" in providing a product or service. (*Id.* at 17). In 1987, Blue Cross audited the University Park cost report for fiscal year 1985, and determined that University Park and East Texas were, indeed, "related by control." (Plaintiff's Second Amended Complaint ¶ 36; Prickett Depo., pp. 15, 17; Simmons Depo. p. 36). With that determination, University Park was not entitled to some of the Medicare reimbursements that it had claimed. The hospital appealed this determination, and so Blue Cross performed another audit in 1991. After that audit, the fiscal intermediary reached the same conclusion. (Plaintiff's Second Amended Complaint ¶¶ 36, 47; Prickett Depo., pp. 13, 23, 105; Simmons Depo., pp. 34–36). As a result of the 1991 audit, Blue Cross found that, in the previous six years, Medicare had overpaid University Park by $2.27 million because, under the regulations, it was a "related party" to East Texas. (Plaintiff's Second Amended Complaint ¶ 47; Dille Memo, p. 2). Blue Cross then adjusted the University Park cost reports from 1985 to 1990. In that adjustment, the hospital's reimbursements for ancillary services were reduced, retrospectively, by approximately $150,000. (*Id.*). In addition, reimbursements for the hospital's lease payments were reduced by $2.12 million. (*Id.*). That amount included "$525,316 of interest related to the capitalized lease" for which the hospital's claim was rejected, as it was deemed a "related organization cost[ ]." (Prickett Depo., p. 37; *and see* Defendants' Third Appendix, p. 205; Evidentiary Appendix, Volume Two of Two to Plaintiff's Response to East Texas Defendants' Motion for Summary Judgment, Docket Entry # 151 ["Plaintiff's Second Appendix"], Ex. 42, p. 2). The hospital did not contest these adjustments, and Blue Cross eventually dismissed the appeal. (Prickett Depo., p. 187; Simmons Depo. pp. 36–39). It should be emphasized, for these purposes, that allegations of "fraud" tied to the "related parties" dispute were addressed by the government as early as 1991.

In April 1995, while Reagan's state lawsuit was pending, but before she had filed this federal action, she contacted Blue Cross to discuss her allegations that University Park and East Texas were engaged in Medicare fraud from 1985 to 1994. (Plaintiff's Second Amended Complaint ¶ 40; Lessard Letter at 1; Kemp Depo., pp. 18, 22–23). In fact, Reagan gave Blue Cross the documents that she believed supported her allegations of fraud connected to Defendant's violations of the CON. (Plaintiff's Second Amended Complaint ¶ 40). At the same time, she gave the fiscal intermediary information about the University Park lease, as well as documents pertaining to other hospital contracts. (*Id.*). In response to Reagan's allegations, Blue Cross began an audit of the hospital's construction costs. From the audit, Blue Cross determined that "the hospital was in compliance with the amended Certificate of Need and the Medicare program suffered no impact." (Lessard Letter, at 1; *and see* Kemp Depo. at 19, 22–23; Plaintiff's Second Amended Complaint ¶ 54).

In September 1997, Blue Cross again scrutinized the hospital cost reports for 1992 through 1994, "to review the related party ancillary costs for reasonableness." (Dille Memo, p.2; *and see* Plaintiff's Second Amended Complaint ¶ 36). At the same time, Blue Cross analyzed the "depreciation costs for the UPH facility," from "the actual and reasonable cost of the building" through its subsequent operational expenditures. (Dille Memo, p.3). In undertaking this review, Blue Cross

was explicit in its intention "to determine if construction costs were in compliance with the original and amended CON," as well as to "audit the entire [ET Medical Center] cost report" for 1995, and to re-examine the 1992–1995 cost reports "if necessitated by the findings on the 1995 audit." (*Id.*). The parties have not produced the 1997 audit results. However, there is no question that these audits were initiated in an attempt "to substantiate the specific allegations of fraud" that Reagan had raised "[o]ver the previous five years." (*Id.* at 1).

From this evidence, it is clear that the facts surrounding the "related party" allegations and allegations of irregularities in the CON were publicly disclosed during the Blue Cross audits, which took place in 1987, 1991, 1995, and 1997. *See* § 3730(e)(4); *Jones,* 160 F.3d at 331; *Dunleavy,* 123 F.3d at 741; *Springfield,* 14 F.3d at 655; *Shell Oil II,* 33 F.Supp.2d at 533; *Wercinski,* 982 F.Supp. at 458. It is also clear that, in adjusting University Park's reimbursements, after it determined that the hospital was related to East Texas, Blue Cross paid particular attention to the hospital's claims for ancillary services and lease payments, including the stated interest expenses. Moreover, it is undisputed that HCFA also reviewed the Blue Cross audit reports, in regard to "allegations of fraud," at Reagan's behest. (Lessard Letter at 1; Plaintiff's Second Amended Complaint ¶ 47, 49, 51). Indeed, the court finds that the HCFA review is evidence of yet another channel through which the relevant allegations and transactions may be deemed to have been made public before Plaintiff filed this suit.

*d. HCFA Investigation*

 The undisputed evidence shows that, in September 1995, following the first three Blue Cross inquiries, Reagan took her allegations of fraud to the senior auditor of the HCFA Regional Office, Freddie Kemp ["Kemp"]. (Kemp Depo. at 11–12). Reagan complained to Kemp about problems with "the certificate of need process," as well as "the cost basis of the [University Park] building or equipment." (*Id.* at 11–12, 14). In January 1996, Reagan gave Kemp the documents she relied on in making her Medicare fraud claims. (*Id.* at 12, 23; Lessard Letter at 1). Kemp examined the papers and concluded that no further investigation of Reagan's allegations was justified. (Lessard Letter at 1; Kemp Depo. at 13). After her complaints were found lacking by HCFA, as well as by Blue Cross, Reagan wrote to the DHHS Chief Counsel, "expressing dissatisfaction" with Kemp's findings. (Lessard Letter at 1). The office of the Chief Counsel reviewed the matter and agreed with Kemp's assessment. It informed Reagan of that decision in a letter sent to her in March 1996. (Lessard Letter at 1–2). In that letter, the DHHS's decision not to make any further investigation of Reagan's claims was made clear, as follows:

> While we agree conceptually that federal law addresses various aspects of fraud against government programs, it is clear that facts, which a citizen not directly involved with law enforcement might construe as fraud, do not always rise to that level. Indeed, ... not every complaint results in a full investigation or presentation to a grand jury for indictment. With finite resources available to investigate allegations of fraud, the investigative experts necessarily must triage all complaints in order to decide which allegations warrant further commitment of resources. One relevant factor that always is considered is whether the various five year statutes of limitations on fraud appl[y] to a given fact situation. Another is the sufficiency or reliability of the evidence supporting the complaint. Based on our review of the situation you have presented in your

letter and our discussions with the investigators with whom you have already spoken, we are convinced their conclusions that further investigation is not warranted were made only after serious attention to all aspects of your allegations, including these factors.

(Lessard Letter at 2) (quoting a "March 5, 1996 reply from the Senior Trial Attorney, on the Chief Counsel's behalf").

Notwithstanding that decision, the HCFA Bureau of Program Operations asked Kemp to again review the Blue Cross audits of University Park's Medicare reimbursement claims. (Lessard Letter at 1; Kemp Depo at 19). Kemp did so, in September 1996, and "found that the audit work papers were well-documented and that the intermediary did an extraordinarily thorough audit." (Lessard Letter at 1; *and see* Kemp Depo. at 19–22, 24–25). In regard to Reagan's specific claims, Kemp determined that "the one allegation that could affect Medicare would have been the cost basis of the building or equipment." (Kemp Depo. at 14). But he stated further that "the certificate of need process didn't affect Medicare ... because that's a state function ... [and] the state approved the entire amount" of the hospital's project costs. (*Id.* at 14–15). Kemp also noted that "Texas sometime in the early '90s got rid of their certificate of need program and [Medicare] no longer required it." (*Id.* at 15). Kemp considered Reagan's additional claim that the University Park lease payment included an unauthorized profit margin for East Texas, and concluded that there was "no harm to Medicare." (*Id.* at 17). That conclusion was based primarily on the finding that, after Blue Cross determined that University Park and East Texas were related organizations, the hospital was no longer reimbursed for East Texas's profits. (*Id.*).

On December 17, 1996, an unnamed informant provided the DHHS Office of Inspector General ("OIG") with "additional documentation ... involving related party transactions." [17] (Plaintiff's Second Appendix, Ex. 45): Redacted Memorandum from M. Ben Jackson, Jr., Acting Director, Programs and Operations Audits, to Donald L. Dille, June 6, 1997 ["Jackson Memo"]; Defendants' Third Appendix, pp. 255–56, Redacted Memorandum from Robert E. Richardson, DHHS Assistant Inspector General for Investigations to George F. Reeb, Assistant Inspector General for Evaluation and Inspections, May 16, 1997 ["Richardson Memo"], p. 1. Four memoranda from the OIG, in redacted form, reflect that this unidentified informant made many of the same allegations that Plaintiff has brought before this court. (*See* Jackson Memo; Richardson Memo; Plaintiff's Second Appendix, Ex. 46: Notes on December 17, 1996 Meeting, prepared by Barbara Jerkins, OIG Senior Auditor, Jul. 21, 1997 ["Jerkins Meeting Notes"]; Plaintiff's Second Appendix, Ex. 47: Memorandum from Barbara Jerkins to OIG, Headquarters Office, Jan. 6, 1997 ["Jerkins Memo"]). These allegations include the following: that there were "problems with related party transactions"; that University Park's building costs and lease payments were inflated; and that East Texas violated the University Park CON because it borrowed $2 million more than the amount approved. (*See* Jerkin's Meeting Notes). Based on those allegations, a

---

**17.** No party has identified, or isolated for the court's review, this "additional documentation." Because of the many redactions in the notes generated by the December 1996 meeting, it is difficult to determine which, if any, of the unnamed informant's allegations had any factual basis. (*See* Jerkins Meeting Notes). Indeed, the DHHS Senior Auditor who reported on the meeting apologized to the intended recipient for the "muddle," and "rambling nature of the notes." (*Id.* at 5).

DHHS Senior Auditor decided, in January 1997, that the Inspector General's office should investigate those claims, as well as the "reasonableness" of any profits to East Texas from "maintenance, lab, and radiology services provided to [University Park]." (Jerkins Memo, p. 2). It appears, however, that the OIG did not take action on this recommendation until June 1997.

In March 1997, Reagan asked Senator Kay Bailey Hutchison to help her obtain financial documents that she had requested from Blue Cross and HCFA, but had not received. (Defendants' Third Appendix, pp. 77–78, E-mail from Sally Reagan to Kay Bailey Hutchison, Mar. 4, 1997 ["Reagan E-mail"]). In her request, Reagan reported that the documents were "central" to her state court case against University Park, which was then underway. (*Id.* at 1). Reagan also stated, emphatically, that she had been fired from the hospital because she attempted "to guard the Medicare coffers, as required under the False Claims Act." (*Id.*). Senator Hutchison's office forwarded Reagan's FOIA request to HCFA. (Defendant's Third Appendix, p. 76, Letter from Office of Senator Kay Bailey Hutchison to HCFA, Apr. 4, 1997 ["Hutchison Letter"]). The agency responded by detailing for Senator Hutchison the actions that it had taken, over the previous two years, in response to Reagan's allegations. (*See generally* Hutchison Letter; Lessard Letter).

Two months later, in June 1997, the Director of Programs and Operations Audits for DHHS determined that it was appropriate to conduct a further administrative review into the unnamed infor-

mant's "allegation of Medicare fraud committed by the University Park Hospital." [18] (Jackson Memo). In response to that determination, a meeting took place among employees from the OIG's Office of Audit Services, from the DHHS Office of Investigations, and from Blue Cross, "to determine if it [was] necessary to reopen a case alleging Medicare fraud by ... University Park ... concerning related-party transactions." (Dille Memo; p. 1). Following that meeting, DHHS and Blue Cross concluded "that additional audit work [was] required to substantiate the specific allegations of fraud or to identify additional overcharges to the Medicare program by UPH or its related parties." [19] (*Id.*). As a result, Blue Cross launched the referenced 1997 audit of University Park's cost reports. (*Id.*). It appears that the audit began on an unspecified date in September 1997, when Blue Cross "re-opened those UPH cost reports still eligible for audit to review the lease expense for reasonableness." (*Id.* at 2). It is logical to conclude from the record that the audit's scope was limited to the documents and allegations that Blue Cross already had before it. Indeed, Reagan has not directed the court to any information or allegation that was not within the government's knowledge before her qui tam claim was filed. Further, even if it could be shown that the audit encompassed data beyond that which had already been reviewed, it bears repeating that Blue Cross's actions were in response to the complaints that Reagan had initiated, "[o]ver the previous five years," about "related party" issues and the hospital's compliance with the CON. (*Id.* at 1).

**18.** This review was to be undertaken even though the Office of Inspector General had determined that "the civil and criminal statute of limitation provisions in this case have run out." (Defendants' Third Appendix, p. 256).

**19.** On October 7, 1997, the OIG's Regional Inspector General for Audit Services submitted a report on this meeting to the Director of Programs and Operations Audits. (*See* Dille Memo).

From the evidence submitted, it is abundantly clear that several government agencies were aware of Plaintiff's fraud allegations, as well as some of the specific transactions from which those allegations arose, and so had been "set ... on the trail of fraud." *See Springfield,* 14 F.3d at 654, *quoted by Rabushka,* 40 F.3d at 1514; *Shell Oil II,* 33 F.Supp.2d at 540. It is indisputable that the government had this information well before September 29, 1997, when Reagan filed this lawsuit. To the extent that Reagan's complaints, and the investigations which followed, "were a matter of public record," they "constitute public disclosures" as a matter of law. *Fed. Recovery Servs., Inc. v. U.S.,* 72 F.3d 447, 450 (5th Cir.1995).

The FCA is explicit in its dictate that the federal district courts may not adjudicate any qui tam action that is "based upon the public disclosure of allegations or transactions in a[n] ... administrative ... hearing, audit, or investigation." 31 U.S.C.A. § 3730(e)(4)(A). Here, Plaintiff's fraud allegations were previously disclosed, not only to Blue Cross, the government's fiscal intermediary, but also to HCFA itself, the federal agency responsible for administering the Medicare program. The question presented, then, is whether that agency performed an "investigation," within the meaning of the FCA. In *U.S. v. Bank of Farmington,* 166 F.3d 853 (7th Cir.1999), the Seventh Circuit addressed the meaning of the term "administrative investigation." In its decision, the court held that an administrative investigation occurs whenever "[a]n official of an administrative agency faced with an anomaly ... in a matter within his purview [makes] an inquiry to an official of a regulated industry for which the agency was responsible." *Id.* at 862. It held further that "[d]isclosure of information to a competent public official about an alleged false claim against the government [is] public disclosure within the meaning of

§ 3730(e)(4)(A) when the disclosure is made to one who has managerial responsibility for the very claims being made." *Id.* This court finds that the Seventh Circuit's reasoning is not only persuasive, but also consistent with the Act's well-settled purpose to prevent "parasitic qui tam actions" based on information that the government is aware of, but "has chosen not to pursue." *See Minn. Assoc. of Nurse Anesthetists v. Allina Health Sys. Corp.,* 276 F.3d 1032, 1042 (8th Cir.2002); *Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 654 (D.C.Cir.1994); *Wercinski v. Int'l Bus. Machines Corp.,* 982 F.Supp. 449, 455 (S.D.Tex.1997). Accordingly, this court accepts, and will apply, the Seventh Circuit's definition of "administrative investigation" for these purposes.

Here, Freddie Kemp, an official with HCFA, the federal agency responsible for regulating the health care industry, reviewed the Blue Cross audit of University Park's Medicare claims, in 1996. It is evident that Kemp's action was in response to Reagan's direct complaints to him about Defendants' allegedly fraudulent conduct. Kemp then made his own inquiry into a matter that was clearly "within his purview." *See Mathews,* 166 F.3d at 862. Other DHHS officials performed similar inquiries in 1997. It is certain that the government became aware of Plaintiff's allegations from her repeated contacts with these DHHS officials and Senator Hutchison. For that reason, this court concludes that there is no question that the allegations and transactions Reagan hopes to pursue in this qui tam action have been publicly disclosed. *See Nurse Anesthetists,* 276 F.3d at 1042; *Mathews,* 166 F.3d at 862; *Fed. Recovery Servs.,* 72 F.3d at 450; *Springfield,* 14 F.3d at 654; *Wercinski,* 982 F.Supp. at 455 From this record, there is no genuine issue of material fact on which Plaintiff can prevail as to that aspect of the FCA's jurisdictional inquiry.

### 2. "Based Upon"

■ Next, the court must determine whether Plaintiff's federal suit is "based upon" the prior public disclosures. *Fed. Recovery Servs.*, 72 F.3d at 450. Reagan argues that it is not, because her current suit involves some elements of fraud that were not previously disclosed, and because it "is the first to synthesize previously disclosed elements into an allegation of fraud." (Response to Motion to Dismiss at 5) (citing *U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1347 (4th Cir. 1994)). But, because "allegations of fraud" were made public during the Blue Cross and DHHS investigations into her claims, that argument is without merit. Further, the Fifth Circuit has held that "an FCA qui tam action *even partly based upon* publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transactions" for purposes of a jurisdictional inquiry. *Fed. Recovery Servs.*, 72 F.3d at 451 (quoting *U.S. ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir.1992)). In *Federal Recovery Services, Inc. v. U.S.*, the qui tam claimant had filed suit first in a state court, and the allegations lodged in that forum involved "the same factual matters as the claim" in federal court. *Id.* Notwithstanding the similarity between the two lawsuits, the corporate relator argued that it had "unearthed additional instances of fraudulent conduct by [the defendant] that were not a part of the earlier, state court litigation." *Id.* For that reason, it argued that the federal suit was not "based on" the earlier state court action. *Id.* The Fifth Circuit disagreed, holding that the plaintiff could not "avoid the jurisdictional bar simply by adding other claims that are substantively identical to those previously disclosed in the state court litigation." *Id.* Here, Reagan has admitted,

in her affidavit, that her claims before this court are "related" to the state court allegation that she was fired because she "discovered Medicare fraud ... among other less than upstanding business practices among defendants." (First Reagan Aff., pp. 4, 6). Further, Reagan points out that the documents obtained in response to her FOIA requests provide "irrefutable proof of [her] allegations in state court, and ... are foundational to [her] current FCA claims." (*Id.* at 5). From Plaintiff's own statements, then, it is obvious that her current suit is "based upon" transactions and allegations that were publicly disclosed in the wrongful discharge litigation. *Fed. Recovery Servs.*, 72 F.3d at 451; *A.D. Roe*, 186 F.3d at 723; *Schumer*, 63 F.3d at 1519–20; *Grynberg*, 207 F.Supp.2d at 1184. Therefore, unless Reagan can be deemed the "original source" for the information on which this suit is based, the statutory jurisdictional limits preclude these claims. *Fed. Recovery Servs.*, 72 F.3d at 451, 452.

### 3. Original Source

■ The False Claims Act defines an "original source" as

> an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(B); *Fed. Recovery Servs.*, 72 F.3d at 451. Here, there is no question that Reagan voluntarily provided information to the government about Defendants' alleged fraud before she filed this suit. The critical inquiry, then, is whether Reagan has, or had, "knowledge of the information on which the allegations are based" that is both "direct and independent." [20] Because this inquiry is juris-

---

20. Plaintiff argues that she is an "original source" of the essential information merely

dictional, Plaintiff has the burden to show that the statutory requirements have been met. *See Santos v. Reno*, 228 F.3d 591, 594 (5th Cir.2000); *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998); *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162 (10th Cir.1999).

The precedents in this circuit require a qui tam claimant to "qualify as an 'original source' to [overcome] the jurisdictional bar of 31 U.S.C. § 3730(e)." *Fed. Recovery Servs.*, 72 F.3d at 451. However, the Fifth Circuit has never had occasion to address, in any detail, the operative language of the FCA's "savings clause for suits brought by 'original sources.'" *See U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir.1991). At least three circuits have confronted this issue, and they have held, uniformly, that "the phrase 'information on which the allegations are based' means 'the information *underlying or supporting* the fraud allegations contained in the plaintiff's *qui tam* complaint.'" *U.S. ex rel. Stone v. Rock-*

*well Int'l Corp.*, 282 F.3d 787, 802 (10th Cir.2002) (quoting *Hafter*, 190 F.3d at 1162); *accord Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 656–57 (D.C.Cir.1994); *Prudential*, 944 F.2d at 1160–61. For that reason, an original source must possess some "essential information underlying the conclusion that fraud had been committed." *Springfield*, 14 F.3d at 657. In fact, those courts have held that "[a] mere assertion of knowledge, without adequate basis in fact and unsupported by competent proof is insufficient to establish jurisdiction." *Hafter*, 190 F.3d at 1163. Instead, the plaintiff must produce "potentially specific, direct evidence of fraudulent activity" by the defendant to establish standing to pursue an FCA claim. *Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562, 568 n. 12 (11th Cir.1994); *accord Wercinski*, 982 F.Supp. at 461. It follows that, to refute Defendants' motion to dismiss, Reagan must show that she is the origin of some evidence showing that East Texas has committed fraud. *See Hafter*, 190 F.3d at 1163; *Cooper*, 19 F.3d at 568 n.12. In addition, although she need not have "per-

because "she played a direct part in the public disclosure of the allegations in [her] complaint." (Response to Motion to Dismiss at 10) (citing *U.S. ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 410 (9th Cir.1993)). This argument is not supported by the case cited or, indeed, by the decisions of any court. It is true that the Second and Ninth Circuits have held that, to be an "original source," a qui tam relator must be the person who *caused* the public disclosure of information. *See, e.g., U.S. v. New York Medical College*, 252 F.3d 118, 120 (2nd Cir.2001); *Barajas*, 5 F.3d at 410. However, the Fifth Circuit has never adopted this jurisdictional standard, and it has been rejected, expressly, by the majority of other circuit courts of appeal. *See U.S. v. Bank of Farmington*, 166 F.3d 853, 865 (7th Cir.1999); *U.S. ex rel. McKenzie v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 942 (6th Cir. 1997); *U.S. ex rel. Findley v. FPC–Boron Employees' Club*, 105 F.3d 675, 690 (D.C.Cir. 1997); *U.S. ex rel. Siller v. Becton Dickinson*

*& Co.*, 21 F.3d 1339, 1355 (4th Cir.1994); *U.S. ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1006–07 (10th Cir.1996); *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 (11th Cir.1994); *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir.1991). Moreover, even the Second and Ninth Circuits have distinguished between "[p]ublicly disclosing the information upon which a *qui tam* suit is based … [and] being an original source of that information." *Dhawan*, 252 F.3d at 122; *and see U.S. ex rel. Devlin v. State of Cal.*, 84 F.3d 358, 361–62 (9th Cir.1996). Those circuits have never held that a relator was an original source *solely* because she was responsible for the public disclosure, but have always required that she also have "direct and independent knowledge" of the information underlying those disclosures. *See Dhawan*, 252 F.3d at 121; *Devlin*, 84 F.3d at 361–62; *Barajas*, 5 F.3d at 411 (citing 31 U.S.C. § 3730(e)(4)(B)).

sonal knowledge of *all* elements of a cause of action," her evidentiary showing must support at least one essential element of *each* of the fraud allegations in her complaint. *Minn. Assoc. of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1050 (8th Cir.2002); *Springfield,* 14 F.3d at 656; *U.S. ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 411 (9th Cir.1993). Here, Plaintiff alleges that Defendants conspired with University Park to defraud the government "by getting false and fraudulent [Medicare] claims allowed or paid," in violation of FCA § 3729(a)(3). (Plaintiff's Second Amended Complaint ¶ 72). Plaintiff also alleges that, after these Medicare claims were paid, University Park, at the direction of East Texas, made "false certifications" in its annual cost reports so that neither entity would have "to disgorge [the] payments." (*Id.* ¶ 66). She claims that this conduct was in violation of FCA § 3729(a)(7). (*Id.*). To sustain this court's jurisdiction over these claims of fraud, Reagan must present some evidence to support each allegation. *See Nurse Anesthetists,* 276 F.3d at 1050; *Springfield,* 14 F.3d at 656; *Barajas,* 5 F.3d at 411; *Wercinski,* 982 F.Supp. at 461.

Clearly, at this stage of the inquiry, the jurisdictional issues are inextricably "intertwined with the merits" of the case. *Hafter,* 190 F.3d at 1159; *Clark v. Tarrant County, Tex.*, 798 F.2d 736, 741 (5th Cir.1986); *Williamson v. Tucker,* 645 F.2d 404, 416 n. 10 (5th Cir.1981); *Wercinski,* 982 F.Supp. at 454. But to establish her standing to prosecute a qui tam claim, a relator must show more than evidence of a meritorious fraud claim. She must also demonstrate that her knowledge of the alleged fraud is both "direct" and "independent." 31 U.S.C. § 3730(e)(4)(B); *Nurse Anesthetists,* 276 F.3d at 1048; *U.S. ex rel. Mathews v. Bank of Farmington,* 166 F.3d 853, 865 (7th Cir.1999); *U.S. ex rel. McKenzie v. BellSouth Telecomm.,*

*Inc.*, 123 F.3d 935, 941 (6th Cir.1997); *U.S. ex rel. Devlin v. State of Cal.*, 84 F.3d 358, 361 n. 5 (9th Cir.1996); *Fed. Recovery Servs.*, 72 F.3d at 448, 451; *Springfield,* 14 F.3d at 656; *Prudential,* 944 F.2d at 1160. Knowledge is generally deemed "independent," if it is derived from some source other than a prior public disclosure. *See Nurse Anesthetists,* 276 F.3d at 1048; *Springfield,* 14 F.3d at 656; *Prudential,* 944 F.2d at 1160; *Wercinski,* 982 F.Supp. at 461. A relator can establish that her knowledge is "independent" by showing that she "had evidence of the fraud prior to the public disclosure of the allegations [or transactions]." *Devlin,* 84 F.3d at 361 n. 5; *and see U.S. ex rel. Barth v. Ridgedale Elec. Inc.,* 44 F.3d 699, 703 (8th Cir. 1995); *Cooper v. Blue Cross & Blue Shield of Fla., Inc.,* 19 F.3d 562, 568 (11th Cir. 1994). To be "direct," the relator's evidentiary showing must have been acquired through her own efforts and observations, "not by the labors of others." *Hafter,* 190 F.3d at 1162; *c.f. Nurse Anesthetists,* 276 F.3d at 1049; *Springfield,* 14 F.3d at 656; *Wang,* 975 F.2d at 1418–20; *Wercinski,* 982 F.Supp. at 461. In that regard, courts have defined "direct knowledge" as knowledge that is "immediate" and "marked by absence of an intervening agency, instrumentality or influence." *Nurse Anesthetists,* 276 F.3d at 1048; *Prudential,* 944 F.2d at 1160; *and see Stone,* 282 F.3d at 799; *Springfield,* 14 F.3d at 656. In sum, to hold the status of an "original source," for purposes of the FCA,

> a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how or when ... she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof. Only in this way will the district court be able to adequately identify legitimate *qui tam* actions and weed out parasitic plaintiffs

who offer only secondhand information, speculation, background information or collateral research.

*Hafter,* 190 F.3d at 1162–63 (citing *U.S. ex rel. Aflatooni v. Kitsap Physicians Serv.,* 163 F.3d 516, 526 (9th Cir.1999); *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 985 F.2d 1148, 1159 (2nd Cir.1993)). Here, then, to satisfy the statute's jurisdictional limits so that she is able to pursue her claims under subsections 3729(a)(3) and (7) of the FCA, Reagan must present competent proof on at least one element of each claim.[21] Further, that proof must also point to Reagan's direct and independent knowledge of the allegedly fraudulent acts. Evidence that is "only secondhand," speculative, or "collateral" is not sufficient to prevent a dismissal of Plaintiff's fraud claims on jurisdictional grounds. Because this is necessarily a fact-based inquiry, each of these claims must be examined in detail.

### a. Plaintiff's Claim Under the "Reverse" False Claim Act

▉▉▉ Plaintiff's first claim is that Defendants knowingly made, or caused to be made, "false certifications of compliance with applicable Medicare statutes and regulations," in the cost reports that University Park filed with Medicare. (Plaintiff's Second Amended Complaint ¶¶ 63, 66). She alleges that these "false certifications" were intended to conceal the fact that the hospital had received Medicare payments to which it was not entitled. (*Id.* ¶¶ 65, 66). Plaintiff contends, further, that the East Texas entities were the ultimate recipients of these sums, which were channeled to them through the lease and ancillary services payments. (Response to Motion to Summary Judgment ¶ 72). Reagan insists that, because University Park, "and ultimately, East Texas," would have been obligated to repay these government funds "if the truth were known," Defendants violated the "reverse False Claims Act," 31 U.S.C. § 3729(a)(7), by submitting the "false" certifications. (Plaintiff's Second Amended Complaint ¶¶ 65, 66, 68).

On this allegation of a "reverse" FCA violation, Defendants argue that it is irrelevant whether Reagan has direct knowledge of facts to prove her allegation because she has not stated a valid claim for relief under the applicable law. (East Texas Defendants' Motion for Summary Judgment ["Motion for Summary Judgment"] ¶¶ 38–41, Docket Entry # 141). Defendants contend that a claim under § 3729(a)(7) requires a showing that the alleged wrongdoer sought to avoid "a preexisting obligation to pay money to the government." (*Id.* ¶ 38) (citing *U.S. v. Q Int'l Courier, Inc.,* 131 F.3d 770, 773 (8th Cir.1997); *U.S. ex rel. S. Prawer & Co. v. Verrill & Dana,* 946 F.Supp. 87, 93–94 (D.Me.1996)). They insist that, because "Reagan has never shown that the East Texas Defendants had an existing obligation to the United States government, ... her 'reverse claims' fail as a matter of law." (*Id.* ¶ 41). In response, Reagan appears to argue that just such an obligation was created when Defendants received the allegedly "excessive" lease and service payments from University Park. (Response to Motion to Summary Judgment ¶ 72). Under the prevailing law, however, that argument does not withstand scrutiny, and the court agrees that, on this allegation, it is unnecessary to explore the source of Reagan's specific knowledge of the facts to prove it.

▉▉▉ Courts have explained that the "so-called reverse false claims provision of

---

21. And, in addition, to survive a competent motion for summary judgment, Reagan must present competent proof on *all* of the essential elements of her claims.

the False Claims Act ... gives the United States a means to recover from someone who makes a material representation to avoid paying some obligation owed to the government." *Q Int'l Courier*, 131 F.3d at 772 (citing S.Rep. No. 99–345, at 15, 18, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5280, 5283); *c.f. U.S. ex rel. Wilkins v. N. Am. Constr. Corp.*, 173 F.Supp.2d 601, 630 (S.D.Tex.2001). As stated earlier, the Fifth Circuit has not yet addressed the contours of this provision. But, of those circuits that have done so, all are in agreement that, to proceed with a "reverse false claim" action, a claimant must show that the United States "was owed a specific, legal obligation at the time that the alleged false record or statement was made." *Q Int'l Courier*, 131 F.3d at 772; *and see U.S. v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236–37 (11th Cir.1999); *Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 736 (6th Cir.1999). Indeed, in *U.S. v. Q Int'l Courier, Inc.*, 131 F.3d 770 (8th Cir.1997), the Eighth Circuit held that,

> The obligation cannot be merely a potential liability; instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness. The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed.

*Id.* at 773, *quoted by Am. Textile Mfrs.*, 190 F.3d at 735; *accord Pemco Aeroplex*, 195 F.3d at 1237. Further, the mere possibility that a defendant may be found liable at some future date for a statutory or regulatory penalty does not amount to an "obligation," for the purposes of the Act. *Pemco Aeroplex*, 195 F.3d at 1238 n. 3; *Am. Textile Mfrs.*, 190 F.3d at 738; *Q Int'l Courier*, 131 F.3d at 774. The Sixth Circuit has likewise held that "[c]ontingent obligations-those that will arise only after the exercise of discretion by government actors-are not contemplated by the statute." *Am. Textile Mfrs.*, 190 F.3d at 738. For that reason, a "defendant does not execute a reverse false claim by engaging in behavior that might or might not result in the creation of an obligation to pay or transmit money or property to the government." *Id.* Instead, the debt "must be for a fixed sum that is immediately due." *Q Int'l Courier*, 131 F.3d at 774.

Here, Plaintiff does not allege that the East Texas Defendants breached any contract with the government to which they were party. Nor does she claim that the government was "the beneficiary of any judgment or acknowledgment of indebtedness" on Defendants' part. *See id.* at 773. Rather, in making her claim, the only "obligation" Reagan points to is one "not to conceal, avoid, or decrease obligations to pay money to the United States under 42 U.S.C. § 1320a–7b(a)(3)," as set out in the criminal health care statute. (Response to Motion to Summary Judgment ¶ 73). But it bears repeating that prosecution of the cited statute is a discretionary governmental act. Because the "obligations" cited by Plaintiff are, if anything, contingent ones, they do not serve to raise an issue of liability under the FCA. *See Am. Textile Mfrs.*, 190 F.3d at 738. For that reason, Plaintiff has not stated a claim for a violation of the "reverse false claim act." *See Pemco Aeroplex*, 195 F.3d at 1236–38; *Q Int'l Courier*, 131 F.3d at 772–74; *Am. Textile Mfrs.*, 190 F.3d at 735–36, 738. It is RECOMMENDED that the claim under FCA § 3729(a)(7) be DISMISSED, with prejudice.

### b. Conspiracy

 Plaintiff also alleges that the East Texas Defendants engaged in a conspiracy to defraud the government.

(Plaintiff's Second Amended Complaint ¶¶ 57–60, 72). On this matter, it must be emphasized that this is Plaintiff's third attempt to craft a valid claim against the East Texas entities. In the current pleading, Reagan's allegation seems to be that Defendants formed an agreement with University Park to submit false information to Medicare and, in so doing, violated § 3729(a)(3) of the Act. (*Id.* ¶ 57). On the other hand, Reagan also claims, repeatedly, that all of the East Texas Defendants are "chain components," and that, at all relevant times, University Park was a "subsidiary" of East Texas. (*Id.* ¶¶ 27, 33–35, 39, 58). In this circuit, it is a matter of law that a parent corporation cannot conspire with its own subsidiary. *Deauville Corp. v. Federated Dept. Stores, Inc.,* 756 F.2d 1183, 1192 (5th Cir.1985) (citing *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)); *accord Elliott v. Tilton,* 89 F.3d 260, 265 (5th Cir.1996) ("a corporation or other company cannot conspire with itself, no matter how many of its agents participate in the complained of action") (quoting *Fojtik v. First Nat'l Bank,* 752 S.W.2d 669, 673 (Tex.App.—Corpus Christi 1988, writ denied)). Because Plaintiff alleges that the pertinent agreement here was among various "components" and "subsidiaries" of the same "parent," it appears that she has not stated a claim for a conspiracy under the FCA. In the alternative, Reagan argues that University Park "operated as the alter ego of East Texas," under Texas law. (Plaintiff's Second Amended Complaint ¶¶ 34, 35). In this state, a court applying the "alter ego theory" in a corporate context will "disregard the separate legal existence of the [alter ego entity] and ... view it as a mere conduit through which the [primary corporate entity] exercised power over all ... decisions." *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 198 (Tex. 1995). If this court were to agree with Plaintiff and apply that concept to her claims, then it follows that University Park has no legal existence that is separate from East Texas. Once again, because East Texas cannot be said to conspire with itself, Plaintiff has not stated a valid claim for relief under FCA § 3729(a)(3). *See Elliott,* 89 F.3d at 265.

Moreover, and perhaps more importantly, even if such a conspiracy is set out in the pleadings, Plaintiff still must provide evidence to show that she is the original source of information that underlies that claim. To prove the existence of a conspiracy, and defeat a proper motion for summary judgment, Reagan must raise a fact issue on each of the elements of a claim under § 3729(a)(3). That is, the evidence submitted must make some showing that Defendants knowingly agreed to defraud the government, that at least one act was performed in furtherance of that conspiracy, and that the government suffered damages as a result of the acts alleged. *U.S. ex rel. Durcholz v. FKW Inc.,* 997 F.Supp. 1159, 1173 (S.D.Ind.1998), *aff'd,* 189 F.3d 542 (7th Cir.1999); *Mikes v. Strauss,* 889 F.Supp. 746, 751 (S.D.N.Y. 1995); *Wilkins ex rel. U.S. v. Ohio,* 885 F.Supp. 1055, 1059 (S.D.Ohio 1995); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259 (S.D.Fla.1989). Further, in this case, even if a prima facie violation is established, the court must engage in additional scrutiny to determine whether Reagan has standing to pursue a conspiracy action under the FCA. To defeat the jurisdictional bar, Reagan must present evidence that she had "direct and independent knowledge" of the relevant facts that would prove at least one essential element of her claim. *See, e.g.,* § 3730(e)(4)(B); *Minn. Assoc. of Nurse Anesthetists v. Allina Health Sys. Corp.,* 276 F.3d 1032, 1048, 1050 (8th Cir.2002);

U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1162–63 (10th Cir.1999); Fed. Recovery Servs., Inc. v. U.S., 72 F.3d 447, 451 (5th Cir.1995); U.S. ex rel Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 656 (D.C.Cir.1994); U.S. ex rel. Barajas v. Northrop Corp., 5 F.3d 407, 411 (9th Cir. 1993); U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1160 (3d Cir.1991); Wercinski v. International Bus. Machines, 982 F.Supp. 449, 461 (S.D.Tex. 1997). Again, because the merits of a claim under the FCA are intertwined with the jurisdictional question, another fact-intensive examination of her allegations is required.

As to the first element of a civil conspiracy, at least one court in this district and division has held, recently, that "[t]he essence of a conspiracy under the FCA is an agreement between two or more persons to commit fraud." U.S. ex rel. Riley v. St. Luke's Episcopal Hosp., 200 F.Supp.2d 673, 676 (S.D.Tex.2002) (on remand) (quoting U.S. ex rel. Atkinson v. Penn. Shipbuilding Co., 2000 WL 1207162 (E.D.Pa.2000)); accord Durcholz, 997 F.Supp. at 1173; Wilkins, 885 F.Supp. at 1063; Provident, 721 F.Supp. at 1259. Although whether an entity participated in a conspiracy "is a question of fact," the record evidence must at least suffice to permit a reasonable jury to conclude that Defendants and University Park shared "a conspiratorial objective." Durcholz, 189 F.3d at 545; U.S. v. Murphy, 937 F.2d 1032, 1039 (6th Cir.1991); and see Riley, 200 F.Supp.2d at 676. To determine whether an unlawful agreement was struck, in violation of FCA § 3729(a)(3), courts should be guided by "general civil conspiracy principles." Durcholz, 189 F.3d at 545 n. 3; Murphy, 937 F.2d at 1039. Courts agree that, to establish the existence of a civil conspiracy, a plaintiff must present evidence to show "a meeting of the minds of two or more persons on the object or course of action." Elliott, 89 F.3d at 265 (citing Massey v. Armco Steel, 652 S.W.2d 932, 934 (Tex.1983)); accord Durcholz, 189 F.3d at 545. In the context of an FCA conspiracy, the evidence must show that the alleged conspirators shared a "specific intent to defraud" the government. U.S. ex rel. Johnson v. Shell Oil Co., 183 F.R.D. 204, 208 (E.D.Tex.1998) ("Shell Oil I"); and see Durcholz, 189 F.3d at 545–46; Riley, 200 F.Supp.2d at 676; Wilkins, 885 F.Supp. at 1063; accord Peavy v. WFAA–TV, Inc., 221 F.3d 158, 173 (5th Cir.2000) (quoting Triplex Communications, Inc. v. Riley, 900 S.W.2d 716, 719 (Tex.1995)); Kerr v. Lyford, 171 F.3d 330, 340 (5th Cir.1999); Riquelme Valdes v. Leisure Resource Group, Inc., 810 F.2d 1345, 1351 (5th Cir.1987). To establish such a "meeting of the minds," it is not sufficient for the plaintiff to provide proof that the alleged conspirators "intended to engage in the conduct that resulted in the injury." Peavy, 221 F.3d at 173 (quoting Triplex Communications, 900 S.W.2d at 719). Instead, "for a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct [to be committed] at the inception of the combination or agreement." Id. (quoting Triplex Communications, 900 S.W.2d at 719). Moreover, "[a]lthough circumstantial evidence may often be used to show intent, this element must be established by full, clear, satisfactory, and convincing testimony." Riquelme Valdes, 810 F.2d at 1351. It follows that, to raise a fact question here, Reagan must provide proof that University Park and East Texas each intended to commit Medicare fraud, and that they entered into an agreement with that specific objective. See Peavy, 221 F.3d at 173; Durcholz, 189 F.3d at 545–46; Elliott, 89 F.3d at 265; Riquelme Valdes, 810 F.2d at 1351; Riley, 200 F.Supp.2d at 676;

*Shell Oil I,* 183 F.R.D. at 208; *Wilkins,* 885 F.Supp. at 1063.

Here, in an attempt to prove that East Texas and University Park agreed to commit fraud, Reagan argues that she "observed" East Texas exercise "dominion and control" over University Park to get false Medicare claims approved by the government. (Response to Motion to Dismiss at 8). Reagan contends, specifically, that "East Texas required UPH to enter into a contract [for] laboratory services" that violated those Medicare regulations which govern "reasonable costs," and, further, that Defendants' agents "knew those charges would be passed on to [M]edicare for reimbursement." (Response to Motion for Summary Judgment ¶¶ 57, 67) (citing, generally, Second Reagan Aff.; Plaintiff's First Appendix, Ex. 3: Affidavit of Charles T. Gregg). She argues, similarly, that the hospital's lease agreement was intended "to funnel Medicare overpayments to UPH's parent and related organization, East Texas." (*Id.* ¶ 25). However, aside from these broad assertions, Plaintiff has not provided any evidence, whatsoever, to show that either party to the lease or the service contracts, to which she was not privy, intended the contracts to be used to defraud Medicare. Indeed, Plaintiff relies entirely on conclusory statements from her own affidavit, and that of her expert witness.[22] (*See id.;* Response to Motion to Dismiss at 8).

▮ Again, regardless of whether Plaintiff has shown sufficient proof of a conspiracy between East Texas and University Park to defeat a summary judgment against her, a pursuit of that inquiry leads the jurisdictional analysis astray. Assuming, for these purposes, that Reagan

has raised a fact issue on her conspiracy claim, she still must show that she is the original source of the information provided to support that allegation. So far as the court can discern, Plaintiff points to only one matter that, arguably, indicates her own direct and independent knowledge of an allegedly unlawful agreement. Reagan states that she "observed the invoices" that Defendants sent to University Park each month for the building's lease and to "charge for clinical laboratory services, maintenance services, and grounds keeping services." (Response to Motion to Dismiss p. 7) (citing Second Reagan Aff. ¶ 32). It is Reagan's contention that she "knew from her personal experience as an administrator" that other psychiatric hospitals paid less for facilities and services similar to those that University Park received from East Texas. (*Id.* at 7, 9). She alleges that the board of directors for East Texas refused her request to reduce its service and lease charges to University Park. (Second Reagan Aff. ¶ 35). This refusal, however, even if true, is not evidence of any "meeting of the minds" by the two companies to commit fraud. *See Peavy,* 221 F.3d at 173; *Durcholz,* 189 F.3d at 545; *Elliott,* 89 F.3d at 265. In fact, Reagan admits that while she was employed with University Park, she had no proof that those charges were "excessive." (Second Reagan Aff. ¶¶ 19, 26, 32). Indeed, Reagan swore in her affidavit that,

It was only after I was terminated that confirming documentation was found through intense, personal effort, piecing together fragments of documentation gathered from multiple sources and locations, and interviews with individuals involved in the CON processes, attorneys,

---

22. For instance, Plaintiff's designated expert witness hypothesizes that *"if* the provider knew that excessive costs were claimed under the capitalized lease payments, *and* the provider filed the cost report claiming excessive costs, [*then*] the provider is in violation of the False Claims Act." (Plaintiff's First Appendix, Ex. 3: Affidavit of Charles T. Gregg, p. 9) (emphasis added).

accountants, government agencies, ....
[as well as] building inspectors, hearing
officers, architects, [and] project super-
visors.

(*Id.* ¶¶ 26, 33). Reagan argues that, from
these documents and interviews, as well as
knowledge she gained from past experi-
ence as a hospital administrator, she was
able to "recognize the puzzle pieces" of
Defendants' wrongful acts. (*Id.* ¶ 31). It
is on that basis that she insists that she is
an "original source" of information that the
service and lease contracts were fraudu-
lent. (Response to Motion to Dismiss at
7).

 Given similar circumstances,
other circuits have been called upon to
decide whether a qui tam relator was an
"original source" of information that was
"pieced together" from various sources.
*See, e.g., U.S. v. N.Y. Med. College,* 252
F.3d 118, 121 (2nd Cir.2001); *U.S. v. Bank
of Farmington,* 166 F.3d 853, 864–65 (7th
Cir.1999); *U.S. ex rel. Fine v. Advanced
Scis., Inc.,* 99 F.3d 1000, 1006–07 (10th
Cir.1996); *U.S. ex rel. Devlin,* 84 F.3d 358,
362–63 (9th Cir.1996); *U.S. ex rel. Barth v.
Ridgedale Elec. Inc.,* 44 F.3d 699, 703–04
(8th Cir.1995); *U.S. ex rel. Kreindler &
Kreindler v. United Techs. Corp.,* 985 F.2d
1148, 1159 (2nd Cir.1993). Each of those
courts has come to the same conclusion.
That is,

> a person who obtains secondhand infor-
> mation from an individual who has direct
> knowledge of the alleged fraud does not
> himself possess direct knowledge and
> therefore is not an original source under
> the Act. Accordingly, "collateral re-
> search and investigations do not estab-
> lish direct and independent knowledge
> of the information on which the allega-
> tions are based within the meaning of
> § 3730(e)(4)(B)."

*Barth,* 44 F.3d at 703 (quoting *Kreindler
& Kreindler,* 985 F.2d at 1159) (altera-
tions omitted); *and see Devlin,* 84 F.3d at

362–63; *Wercinski,* 982 F.Supp. at 461
(both quoting *Barth*); *c.f. Hafter,* 190
F.3d at 1162–63. One illustration of this
"collateral research" is detailed in *U.S. ex
rel. Barth v. Ridgedale Electric Inc.,* 44
F.3d 699 (8th Cir.1995). In *Barth,* the
entity suing on behalf of the United
States was an electrical workers' union.
The union alleged that a federal contrac-
tor, Ridgedale Electric, had submitted
payroll reports to the government that
falsely characterized the labor performed
by its employees and, by so doing, had
violated the FCA. *Id.* at 701. This allega-
tion was based on information that a un-
ion representative obtained through three
sources:

> (1) his visits to ... project job site[s]
> and his observations of individuals doing
> electrician's work; (2) copies of publicly-
> filed payroll records indicating these
> employees were not being paid electri-
> cians' wages; and (3) his interviews with
> Ridgedale's employees.

*Id.* at 703–04. From this evidence, the
district court found, and the Eighth Circuit
agreed, that "the Union did not have origi-
nal source standing because [the represen-
tative] did not have direct knowledge ...
of the manner in which Ridgedale classi-
fied its employees; instead he obtained
this information through intermediary
sources." *Id.* at 703. Because the union
representative "simply gather[ed] informa-
tion," he was deemed "a recipient of infor-
mation and not a direct source." *Id.* at
704. Further, other courts addressing the
issue place no importance on the fact that
a recipient of publicly disclosed informa-
tion possessed "unique experience or train-
ing," which permitted her "to recognize
the legal consequences" of the information.
*A–1 Ambulance Serv., Inc. v. California,*
202 F.3d 1238, 1245 (9th Cir.2000) (quoting
*U.S. ex rel. Findley v. FPC–Boron Em-
ployees' Club,* 105 F.3d 675, 688 (D.C.Cir.
1997)). Indeed, every court that has con-

sidered the question has held that, to be deemed an "original source," a qui tam plaintiff "must possess substantive information about the particular fraud, rather than mere background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation." *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1160 (3d Cir.1991), *quoted by Cooper v. Blue Cross & Blue Shield of Florida, Inc.,* 19 F.3d 562, 568 n. 12 (11th Cir.1994); *and Springfield,* 14 F.3d at 655.

Here, as in *Barth,* Plaintiff gathered information about Defendants' allegedly fraudulent conduct from publicly filed documents and interviews with others. *See* 44 F.3d at 704. Although Reagan's "unique prior experiences" arguably allowed her to make better sense of this information, her background alone does not change her status from "recipient of information" to "direct source." *See A–1 Ambulance Serv.,* 202 F.3d at 1245; *Findley,* 105 F.3d at 688; *Cooper,* 19 F.3d at 568 n. 12; *Springfield,* 14 F.3d at 655; *Prudential;* 944 F.2d at 1160. On this record, the evidence does not support a finding that Reagan has "direct and independent knowledge" that Defendants conspired with University Park to commit fraud. *See* 31 U.S.C. § 3730(e)(4)(B); *U.S. ex rel. Stone v. Rockwell Int'l Corp.,* 282 F.3d 787, 802 (10th Cir.2002); *Nurse Anesthetists,* 276 F.3d at 1050; *Barth,* 44 F.3d at 703–04; *Springfield,* 14 F.3d at 656; *Wang v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir.1992); *Prudential,* 944 F.2d at 1160. Accordingly, there is no evidence to support the assertion that Reagan is an "original source" of information underlying the first element of her conspiracy claim. *See Nurse Anesthetists,* 276 F.3d at 1048, 1050; *Hafter,* 190 F.3d at 1162–63; *Fed. Recovery Servs.,* 72 F.3d at 451; *Springfield,* 14 F.3d at 656; *Prudential,* 944 F.2d at 1160; *Wercinski,* 982 F.Supp. at 461.

As to the second requisite element, that Defendants, or others, acted to further the alleged conspiracy, Plaintiff merely relies on the undisputed fact that University Park submitted annual cost reports to Medicare from 1985 to 1994. There is no doubt that the hospital's cost reports are relevant to the fraud allegations in this lawsuit. This entire litigation is premised on Plaintiff's allegation that the information in these reports was "false." On this point, Reagan contends that she is an "original source" of the "false" cost-report information because, as University Park's executive director, she "learned about interest overcharges in the medicare cost report for fiscal year end December 31, 1991, which she initially signed [in March 1992] but decided not to submit to [M]edicare because of these overcharges." (Response to Motion to Dismiss at 9; *and see* Plaintiff's Second Amended Complaint ¶ 19). In her affidavit, Reagan stated that,

> I placed the Medicare Cost report . . . in my desk so that it would not inadvertently be sent to Blue Cross . . . while I continued to try to obtain the historical cost information that I needed [to accurately report UPH's costs in Medicare Cost Reports and to certify compliance with Medicare program regulations]. However, sometime after I was terminated, the Medicare cost report was taken from my desk and was submitted under my signature without my knowledge or consent. It was dated after my termination by someone else.

(Second Reagan Aff. ¶¶ 24, 25; *and see* Plaintiff's Second Appendix, Ex. 54: University Park Cost Report for 1991). From this testimony, it is clear that Reagan had direct knowledge of the information in the 1991 University Park cost report. She not only saw that report, but signed it in preparation for submission to Blue Cross. There is no similar evidence, however, that

Reagan had direct knowledge about the cost reports for 1985–1990 and 1992–1994. Further, Reagan stated, explicitly, that the 1991 cost report was sent to Medicare "without [her] knowledge" and, apparently, she did not become aware that it had been submitted for payment until 1996. (Second Reagan Aff. ¶ 25; *and see* Plaintiff's Ex. 54: Certification of True Copy of University Park Cost Report for 1991). It was only then, when she received a copy of the 1991 cost report, in response to her request under the Freedom of Information Act, that she saw that it had been amended and sent to Blue Cross. (*Id.;* Plaintiff's Second Appendix, Ex. 55: Affidavit of John R. Craddock ["Craddock Aff."], p. 5). Before this court, Reagan is relying on that FOIA disclosure as the basis for her claim that University Park made a false submission to Medicare in 1991. Clearly, her knowledge of that information is not "independent" of the prior public disclosure. *Nurse Anesthetists,* 276 F.3d at 1048; *Devlin,* 84 F.3d at 361; *Barth,* 44 F.3d at 703; *Cooper,* 19 F.3d at 568; *Prudential,* 944 F.2d at 1160; *Wercinski,* 982 F.Supp. at 461; *and see Springfield,* 14 F.3d at 656 ("Knowledge of the allegedly misrepresented state of affairs-which does not necessarily entail knowledge of the fact of misrepresentation-is *always* in the possession of the government."). Accordingly, Reagan has not shown that she is an "original source" of evidence that Defendants committed acts to further the alleged conspiracy.

◼ The final element of an FCA conspiracy claim is that "the United States suffered damages as a result of the [allegedly] false or fraudulent claim." *Wilkins ex rel. U.S. v. Ohio,* 885 F.Supp. 1055, 1059 (S.D.Ohio 1995). Again, Reagan alleges that University Park submitted claims to Medicare that were fraudulent for one of three reasons: false assertions that it complied with the CON requirements; false assertions that it complied

with the applicable Medicare regulations; and false assertions that University Park was not "related" to the East Texas Defendants. (*See, generally,* Plaintiff's Second Amended Complaint; Response to Motion for Summary Judgment). The first alleged falsehood, that Defendants violated the terms of the original Certificate of Need, is related to Reagan's complaint that the Texas Health Facilities Commission authorized East Texas to finance only 70% of the hospital project costs and, instead, Defendants financed the entire project with revenue bonds. (Plaintiff's Second Amended Complaint ¶¶ 14–16, 36). Plaintiff claims that, because Defendants borrowed more money than the Commission had approved, additional interest expenses accrued which raised the cost of construction to improper levels. (*Id.* ¶ 14). Those construction costs were then misrepresented to the Commission, to gain approval for the 1985 amendment to the CON. (*Id.* ¶¶ 27, 28). Plaintiff alleges, in fact, that the hospital's "actual construction cost was approximately half" of the $6.2 million reported. (*Id.* ¶ 27). Reagan contends that these misrepresentations injured the government because Medicare reimbursed the hospital for the "overstated" construction costs as well as the interest on the bonds. (Second Reagan Depo., p. 38). However, Freddie Kemp, the HCFA's senior auditor, testified at deposition that the CON was "a state function," and that the State of Texas did, in fact, approve the hospital's increased construction and interest costs in 1985. (Kemp Depo., pp. 14–15). For that reason, even if Plaintiff's allegations are true, and Defendants did obtain the CON amendment by using false information, Kemp is clear in his statement that the misrepresentations "didn't affect Medicare." (*Id.* at 14). Plaintiff argues with Kemp's assessment and characterizes it as "flat out wrong," but she has presented no

evidence that controverts it. (Plaintiff's Supplemental Response to the East Texas Defendants' Motion for Summary Judgment ¶ 16, Docket Entry # 172). At most, the record shows that, in 1997, DHHS asked Blue Cross to investigate Reagan's claim regarding violations of the CON. (Dille Memo, p.1; Plaintiff's Second Appendix: Ex. 46, 47). But there is no evidence, or even argument, that this investigation revealed any injury to the government in the CON process. This court concludes, therefore, that Reagan has not raised a genuine issue of material fact on whether the United States was injured as a result of Defendants' false statements about compliance with the CON, and so, again, it is irrelevant whether she had "direct and independent knowledge" of the alleged misrepresentations.

The next falsehood Reagan alleges is the hospital's annual certification that it was in compliance with all applicable Medicare regulations. (Plaintiff's Second Amended Complaint ¶¶ 20–23, 31). Reagan argues that this assertion was false because University Park failed to maintain accurate expenditure records. (*Id.* ¶¶ 20, 32). However, Plaintiff never alleges how this failure resulted in harm to the government, a necessary element of a claim under § 3729(a)(3). Plaintiff argues further that the hospital's costs for its lease and ancillary services exceeded "what a prudent buyer would have paid," and so Medicare regulations on "reasonable costs" were violated in that way. (*Id.* ¶¶ 22, 31, 38, 58–59). On this claim, she maintains that the government was injured because University Park was reimbursed for these "excessive" sums. (*Id.* ¶ 23, 31, 38). However, as shown, the information on which Plaintiff relies, to support these claims of "unreasonable" contracts with East Texas, was obtained through "collateral research and investigations," not through her own direct and independent observations. (Reagan's Second Aff. ¶¶ 19, 26, 31–33).

For that reason, Reagan is not an "original source" of this information, and she is precluded from a pursuit of this claim under the FCA. *See Nurse Anesthetists,* 276 F.3d at 1049; *A–1 Ambulance Serv.,* 202 F.3d at 1245; *Hafter,* 190 F.3d at 1162–63; *Findley,* 105 F.3d at 688; *Devlin,* 84 F.3d at 362–63; *Barth,* 44 F.3d at 703–04; *Kreindler & Kreindler,* 985 F.2d at 1159 (2nd Cir.1993); *Prudential,* 944 F.2d at 1160; *Wercinski,* 982 F.Supp. at 461.

The third falsehood that Reagan complains of is the representation that University Park was not a "related party" to East Texas, and so received unwarranted Medicare funds from 1985–1992. (Plaintiff's Second Amended Complaint ¶¶ 17, 19, 24, 33, 39, 60, 63). Plaintiff describes this injury to the government as overpayments to University Park in the amount of $2,957,393. (Response to Motion for Summary Judgment ¶ 24). Plaintiff does concede, however, that these reimbursements were "later adjusted" by Blue Cross, and that the excess funds were returned to the government. (*Id.* ¶¶ 27–33). Her claim that the government suffered an injury is therefore without merit, because any economic injury that it suffered, whether as a result of fraud or not, has already been compensated. And, again, the evidence Reagan relies on to support this claim was not acquired through her own "direct and independent" observations. It was the Blue Cross audits, on behalf of the government, that uncovered the overpayments at issue. Indeed, even after this litigation had been pending for two years, Plaintiff's designated expert witness stated that "the documentation, records and information necessary to make ... calculations [on the amount of damages in this case] are not currently available." (Plaintiff's Designation of Expert Witnesses, Ex. C: Letter from Herbert L. Lyon, PhD. to John R. Craddock, Apr. 30, 1999, Docket Entry # 81). Clearly, there is no showing that

Reagan is the original source of information underlying her allegation that the government was injured by Defendants' allegedly fraudulent activities.

In sum, Reagan cannot show that she is an original source of any information on which her allegations of FCA conspiracy are based. *See, e.g.,* 31 U.S.C. § 3730(e)(4)(B); *Fed. Recovery Servs., Inc. v. U.S.,* 72 F.3d 447, 451 (5th Cir.1995); *U.S. ex rel. Stone v. Rockwell Int'l Corp.,* 282 F.3d 787, 802 (10th Cir.2002); *Nurse Anesthetists,* 276 F.3d at 1050; *Hafter,* 190 F.3d at 1162–63; *Devlin,* 84 F.3d at 361; *Barth,* 44 F.3d at 703–04; *U.S. ex rel Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 656 (D.C.Cir.1994); *Wang v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir. 1992); *Prudential,* 944 F.2d at 1160; *Wercinski,* 982 F.Supp. at 461. Specifically, she has not provided evidence to show that she had "direct and independent knowledge" of any competent proof that would support any one of the three essential elements of a claim under FCA § 3729(a)(3). That is, Reagan has not shown that she is the original source of evidence to show that East Texas and University Park entered into a knowing agreement to defraud the government, or that the alleged conspirators performed acts to further that conspiracy, or that the government suffered damages as a result. For that reason, Reagan has not raised a genuine issue of material fact on whether she meets the jurisdictional requirements of the Act, and it is RECOMMENDED that her claim for a civil conspiracy under the FCA be DISMISSED, with prejudice.

In the alternative, even if it could be said that Reagan had "standing" to pursue this claim, she has not alleged that two or more unrelated corporate entities entered into an agreement to commit fraud, and so she has not stated a claim for which relief can be granted, under the Act. *Elliott v. Tilton,* 89 F.3d 260, 265 (5th Cir.1996);

*Deauville Corp. v. Federated Dept. Stores, Inc.,* 756 F.2d 1183, 1192 (5th Cir.1985); *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 198 (Tex.1995); *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.,* 200 F.Supp.2d 673, 676 (S.D.Tex.2002). In addition, Reagan has not presented sufficient evidence to show that East Texas and University Park shared a "specific intent to defraud" the government, so that a reasonable jury could conclude that such an agreement existed. *See Peavy v. WFAA–TV, Inc.,* 221 F.3d 158, 173 (5th Cir.2000); *Kerr v. Lyford,* 171 F.3d 330, 340 (5th Cir.1999); *Riquelme Valdes v. Leisure Resource Group, Inc.,* 810 F.2d 1345, 1351 (5th Cir. 1987); *U.S. ex rel Durcholz v. FKW Inc.,* 189 F.3d 542, 545–46 (7th Cir.1999); *Riley,* 200 F.Supp.2d at 676; *U.S. ex rel. Johnson v. Shell Oil Co.,* 183 F.R.D. 204, 208 (E.D.Tex.1998); *Wilkins ex rel. U.S. v. Ohio,* 885 F.Supp. 1055, 1063 (S.D.Ohio 1995). Finally, the evidence does not show that the government suffered any injury as a result of the conspiracy alleged, a necessary element to a claim under FCA § 3729(a)(3). *See Durcholz v. FKW Inc.,* 997 F.Supp. 1159, 1173 (S.D.Ind.1998); *Mikes v. Strauss,* 889 F.Supp. 746, 751 (S.D.N.Y.1995); *Wilkins,* 885 F.Supp. at 1059; *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259 (S.D.Fla.1989). To date, Reagan has not raised a genuine issue of material fact on whether that statute was violated by these Defendants.

**Conclusion**

Based on the foregoing, it is RECOMMENDED that Defendants' motion for summary judgment be GRANTED, and that Plaintiff's Second Amended Complaint be DISMISSED, with prejudice.

The Clerk of the court shall send copies of this memorandum and recommendation to the respective parties who will then

have ten (10) days from the receipt of it to file written objections thereto, pursuant to 28 U.S.C. § 636(b)(1)(C), General Order 80–5, S.D. Texas. Objections, if any, are to address only those findings that supplement or amend the original memorandum and recommendation. Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings or legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Vanessa D. Gilmore, and to the chambers of the undersigned, Room 7007. Dated: Feb. 10, 2003.